UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LYNX WHOLE LOAN
ACQUISITION LLC,

          Plaintiff,

    -against-

CALIBER HOME LOANS, INC.,

          Defendant.

**Civil Action No. _____**

**COMPLAINT**

---

Plaintiff Lynx Whole Loan Acquisition LLC ("Lynx" or "Plaintiff"), by and through its undersigned attorneys, brings this Complaint against Defendant Caliber Home Loans, Inc. ("Caliber" or "Defendant"), and alleges as follows:

**NATURE OF THE CASE**

1.     Lynx brings this action to recover damages Caliber caused by repeatedly and materially failing to properly service thousands of mortgage loans Caliber sold Lynx, in breach of the parties' Mortgage Loan Purchase, Sale, and Servicing Agreement (the "Agreement").[1]

2.     Under the Agreement, Lynx purchased $1.769 billion in distressed, nonperforming Mortgage Loans from Caliber. Caliber enjoyed immediate economic benefit under the Agreement by way of upfront payment from Lynx. Lynx's economic benefits under the Agreement, on the

---

[1]  The parties' original agreement (attached hereto as **Exhibit B**) is dated December 30, 2020. It was amended twice: once on April 29, 2021 (an amendment which applied globally to all prior and subsequent transactions), and again on July 1, 2021 (an amendment which applied only to the July 1, 2021 transaction). Those amendments are attached hereto as **Exhibit C** and **Exhibit D**, respectively. Plaintiff has created a single document that reflects the terms of the parties' parties' original agreement together with the two amendments (attached hereto as **Exhibit A**). All references to the "Agreement" herein refer to the terms reflected in Exhibit A. Unless otherwise defined herein, capitalized terms used in this Complaint shall have the same meaning as those defined in the Agreement.

other hand, would accrue at a later date, and depend upon, *inter alia*, Caliber servicing those loans as promised. To protect its investment, Lynx secured robust covenants, representations, and warranties from Caliber in the Agreement about how Caliber would service the Mortgage Loans.

3. Among other things, Caliber promised to "***take or cause to be taken all actions necessary or appropriate to preserve and maximize the value of each Mortgage Loan***." In addition, Caliber promised to, at a minimum, comply with federal agency requirements, industry standards, the terms of the Agreement, and the relevant mortgage loan documents. Caliber also promised, among other things, to service the loans Lynx purchased with the same care used to service its own loans, and to avoid taking any action that would have a material and adverse impact on the value of any Lynx-owned Loan. *See* Agreement §§ 24.01(a) - (c).

4. Caliber further expressly represented, warranted, and covenanted to Lynx that, at all times while servicing Lynx's Mortgage Loans, it could comply with all of its covenants under the Agreement, including its covenant to maximize the value of the loans; that its servicing activities would comply with federal agency requirements and industry standards; and that all information it provided pursuant to the Agreement would be complete and accurate in all respects. Agreement §§ 6.02(e), (f), (k).

5. Unfortunately, Caliber failed miserably in upholding its end of the bargain. Among other issues, soon after the parties entered into the Agreement, Caliber undertook a series of personnel and computer system changes that wreaked havoc on the company's ability to perform its covenants and satisfy its representations and warranties to Lynx. In the end, Caliber fundamentally failed to maximize the value of Lynx's Mortgage Loans and even failed to comply with basic federal agency requirements governing servicers of these types of mortgage loans.

Caliber's substandard servicing directly and materially reduced the value of the Mortgage Loans and Lynx's interests therein.

6.    For example, Caliber failed to modify loans at the pace mandated by the U.S. Department of Housing and Urban Development, which states that servicers "must complete a loss mitigation option for [borrowers] no later than 120 Days from the earlier of the date of completion or expiration of the forbearance."  Caliber also failed to modify loans in accordance with a Veterans Affairs requirement that all loan documents must be "fully executed not later than 120 days after the borrower exits the COVID-19 forbearance."  For over a thousand of Lynx's Mortgage Loans, Caliber failed to meet these required timelines.

7.    Caliber also modified some of Lynx's Mortgage Loans at interest rates that failed to "maximize the value" of the Loans.  Even when Caliber had more economically efficient paths for modification and redelivery that would have been better for both Lynx and the borrower, Caliber chose the modify loans at rates that forced Lynx to sell Mortgage Loans into GNMA pools at a significantly lower value compared to what Lynx could have realized had Caliber lived up to its commitments.

8.    In the summer and fall of 2022, Lynx asserted its right to compensation for various Caliber servicing issues, although Lynx lacked adequate information to understand the breadth of Caliber's breaches.  Caliber refused to acknowledge its servicing failures or to compensate Lynx, instead abruptly resigning as the servicer of the Mortgage Loans in November 2022.

9.    Caliber's resignation unfortunately did not stop its breaches under the Agreement. In accordance with the post-termination process set forth in the Agreement, Lynx engaged a third-party valuation firm to appraise Caliber's servicing rights (which transferred to Lynx in the event of a resignation) so that the parties could close out their relationship.  Depending upon the interest

rate environment, the value of servicing rights can be either positive or negative; in fact, the third-party valuation firm determined that Caliber's servicing rights were worth *negative* $2.2 million, meaning it cost more to service the loans than the fees such servicing yielded.  Under the Agreement, Caliber owed Lynx the difference.  Agreement § 24.12(b).  Caliber brazenly breached this obligation, and refused to pay Lynx this contractually-agreed upon amount.

10.     On July 25, 2023, Lynx notified Caliber of its breaches and demanded redress for the harm caused by Caliber's conduct.  Caliber responded that it would not pay anything and wanted more information.

11.     On June 20, 2024, Lynx followed up with additional information regarding the nature of the breaches it identified and its calculation of damages based on the limited information available to Lynx.  Caliber hired new counsel and responded on July 22, 2024 without offering any evidence that Lynx's understanding of the facts herein is mistaken.

12.     On August 19, 2024, Lynx again requested that Caliber provide basic information about its servicing activities.  Caliber did not respond.

13.     On January 30, 2025, Lynx renewed its repurchase demands, again describing Caliber's servicing failures, and again including a loan-by-loan calculation of damages.  Caliber still refused to pay.  On March 6, 2025, Lynx supplemented its January 30, 2025 repurchase demand by identifying additional breaching loans, but Caliber continued to stonewall.

14.     Lynx brings this case to seek redress for the wrongs Caliber has committed.

## PARTIES

15.     Plaintiff Lynx is a limited liability company with three individual members, all of whom are residents of Colorado.

16.     Defendant Caliber is an originator and servicer of mortgage loans.  Caliber is a corporation organized under the laws of the State of Delaware, with headquarters in Texas.

**PERSONAL JURISDICTION, VENUE, AND JUDICIAL ASSIGNMENT**

17.    This Court has personal jurisdiction over Caliber and venue is appropriate because Caliber has irrevocably submitted to the exclusive jurisdiction of state and federal courts of New York county.  Pursuant to Section 6.07 of the Agreement, "[a]ny legal proceeding" involving claims "arising under or relating to [the Agreement] or any transaction contemplated [t]hereby (each a 'Covered Action') shall be commenced, heard, and determined exclusively in any state or federal court located in New York county in the State of New York. . . .  Each party (a) covenants not to commence any Covered Action except in such courts, (b) submits, for itself and its property, to the personal jurisdiction of such courts for purposes of each covered action, [and] (c) waives, to the fullest extent permissible by applicable law, all objections that such courts are an inconvenient forum or improper venue for any covered action . . . ."

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship as Lynx is a citizen of Colorado and Caliber is a citizen of Delaware and Texas.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

**FACTS**

**I.    BACKGROUND ON MORTGAGE SERVICING AND EBO LOANS.**

**a.    Mortgage Servicer Obligations And Mortgage-Backed Securities.**

19.    Mortgage loan servicers are responsible for the "care and feeding" of a loan – doing the things necessary to preserve and enhance the loan's value.  Among other responsibilities, servicers collect payments of principal and interest; ensure property taxes are paid and insurance coverage does not lapse; perform investor accounting functions; and provide investors with information about the loans being serviced.

20.    Servicers also assist with efforts to rehabilitate loans when borrowers are not making timely payments, including through loan modifications that alter the original terms of the

loans.  The various methods servicers can deploy to rehabilitate distressed loans are known as "loss mitigation."

21.    During the relevant timeframe, Caliber serviced loans insured by the United States Department of Veterans Affairs (the "VA"), the United States Department of Agriculture (the "USDA"), and the United States Department of Housing and Urban Development ("HUD") via its subsidiary organization, the Federal Housing Authority ("FHA").

22.    During the relevant timeframe, Caliber also caused the issuance of securities backed by these loans, which are generally bundled (or "pooled") together based on characteristics like maturity date.  Such pooled mortgages are then sold to trusts that structure mortgage-backed securities ("MBS") to sell to investors.  The interest paid to an MBS investor equals a portion of the principal and interest payments generated by the underlying loan pool.  The United States MBS market is one of the largest global fixed-income markets, with more than $11 trillion of securities outstanding.

23.    MBS backed by government-insured loans receive an additional layer of protection: the Government National Mortgage Association ("GNMA"), a government corporation within HUD, guarantees that these MBS will timely pay interest to investors, even if homeowners default on the underlying mortgages.  GNMA thus lessens the risk on these securities, an effect that trickles down to make government-insured loans more affordable for homebuyers.

24.    In connection with this structure, when a mortgage in a GNMA-guaranteed MBS pool defaults, GNMA requires the servicer to advance the principal and interest owed by the delinquent borrower while the loan remains securitized.  This is a significant liability for mortgage servicers who package loans into GNMA MBS pools.  Servicers can mitigate this liability by exercising a right to purchase loans that have missed three or more payments.  Loans eligible to

be bought out by servicers are called early-buyout option ("EBO") loans.  Buying out EBO loans eliminates the obligation to continue advancing principal and interest, but requires paying off the defaulted loan's remaining principal balance.

### b.  Relationship Between EBO Loan Investors And Loan Servicers.

25.  Purchasing EBO loans can thus reduce servicer liabilities, but requires a substantial amount of capital.  Servicers like Caliber therefore often rely on secondary market investors to work with them to purchase EBO loans.  These EBO investors bring the resources to purchase large numbers of loans, but generally do not have servicing capabilities.  Lynx is one such investor.  EBO investors like Lynx provide financing with the understanding that if servicers comply with their servicing obligations, and the loans become reperforming, the loans may become eligible for redelivery into a GNMA pool and sold at a profit.  This is the primary objective of EBO investors: swift and successful redelivery of the EBO loans into newly created GNMA pools.

26.  The profitability of EBO investments thus depends heavily on servicers' performance.  Accordingly, EBO investors often require servicers to commit to substantial representations, warranties, and covenants in loan purchase agreements that protect investors prior to making their investments.  Such provisions can set requirements and standards for how servicers conduct their servicing activities, with the goal of incentivizing the servicer to undertake efforts to maximize the value of the loans.

27.  Another standard provision of such agreements is that servicers commit to meet requirements set by federal agencies, including those related to modification timelines.  Interest rate fluctuation can present risk to loan owners—all else equal, if rates increase after a loan has been modified but before it is redelivered into a securitization, the redelivery value of the loan will decrease.  To partially mitigate this risk, investors rely on servicers to quickly modify the loans— at minimum, within the time period set out by the  federal agencies—such that the risk of

misalignment between loan interest rates and market interest rates at the time of redelivery is minimized.

28.     Investors also typically require servicers to provide accurate information about the status of loans undergoing the modification process, including correct and timely information about when a modified interest rate is agreed for a given loan and what the loan's new interest rate will be.

      **c.**      **Regulations Applicable To Loan Modifications Following COVID-19.**

29.     The COVID-19 pandemic caused many borrowers to experience financial difficulties.  The VA, USDA, and FHA responded by implementing forbearance programs that allowed borrowers to pause or reduce payments on their mortgages temporarily.  Servicers of such loans were responsible for "loss mitigation" efforts to return forbearance loans to good standing. For example, servicers could undertake efforts to modify loans to alter the interest rate on the loan, to extend the loan repayment period, or to use what are called partial claims, a mechanism allowing arrearages to be placed in a subordinate position to the rest of the loan.

30.     On July 23, 2021, HUD and the VA issued rules requiring servicers to move forward promptly in completing loss mitigation options for all COVID-19 loans exiting forbearance.  Specifically, HUD and VA mandated that servicers complete a loss mitigation option for such borrowers within 120 days from the end of the forbearance period.  *See* HUD Mortgagee Letter 2021-18 ("The Mortgagee [(in this case, Caliber)] must complete a loss mitigation option for these Borrowers no later than 120 Days from the earlier of the date of completion or expiration of the forbearance."); VA Circular 26-21-13: COVID-19 Home Retention Waterfall and COVID-19 Refund Modification (Jul. 23, 2021) (requiring "all loan documents to be fully executed not later than 120 days after the borrower exits the COVID-19 forbearance").

**II.     CALIBER PROMISED TO MAXIMIZE THE VALUE OF LOANS IT SOLD TO AND SERVICED FOR LYNX.**

**a.      Caliber Agrees To Sell Mortgage Loans To Lynx And Service Those Loans.**

31.     Caliber entered the pandemic servicing a large volume of VA, USDA, and FHA loans that had been securitized into GNMA pools.  Many of these loans also were subject to forbearance programs.  Caliber thus faced significant financial obligations on loans that were not timely paying, was incentivized to do EBO deals, and needed investors for EBO loans.

32.     In September of 2020, Lynx and Caliber began negotiating a potential deal, under which Caliber would buy EBO-eligible loans out of GNMA pools, and Lynx would purchase some of these loans, while Caliber would continue servicing the loans.

33.     Over the course of the following months, Lynx and Caliber engaged in  discussions regarding Caliber's servicing operations and modification procedures and Lynx's requirements. During the course of those negotiations, Caliber boasted to Lynx that it was "position[ed] . . . to succeed in any rate environment" thanks in part to its "[r]obust servicing platform spanning performing and non-performing servicing" and its experienced personnel, including a "specialized underwriting team."  In fact, Caliber told Lynx that, as of September 2020, it was completing modifications in under 60 days.

34.     On December 31, 2020, the parties entered into the Agreement.  Pursuant thereto, Lynx purchased roughly $1.769 billion in EBO Mortgage Loans from Caliber and entrusted Caliber with servicing the Mortgage Loans in accordance with the terms of the Agreement.

**b.**          **Caliber's Covenants, Representations, And Warranties As Servicer.**

35.     As Lynx's servicer, Caliber's fundamental obligations to Lynx under the Agreement included servicing the Mortgage Loans promptly in a manner that maximized their value, and repositioned reperforming loans for redelivery into GNMA Pools as quickly as possible.

**i.  Caliber Promised To Maximize The Value Of The Loans.**

36.     In the Agreement Caliber promised to: (i) "take or cause to be taken all actions necessary or appropriate *to preserve and maximize the value of each Mortgage Loan* and . . . the ability and eligibility of each Mortgage Loan to be delivered into GNMA Pools for securitization into a GNMA MBS," Agreement § 24.01(b); (ii) "perform the administration, collection, and servicing of Mortgage Loans . . . in a manner consistent with all Customary Servicing Procedures,[2] *id.* § 24.01(a); (iii) act "in no event with any less than the same degree of care, diligence, and prudence that the Seller uses when servicing mortgage loans of the same type as the Mortgage Loan for the Seller's own account," *id.*; and (iv) "not take or cause to be taken any action that would have a material adverse effect upon the value of any Mortgage Loan," *id.* § 24.01(c). Likewise, Caliber also expressly agreed to assume an overarching "duty, obligation, and responsibility *to perform all loan . . . servicing functions with respect to the Mortgage Loans on behalf of, for the benefit of, and in the best interest of [Lynx]*." *Id.* § 24.03.

37.     Caliber acknowledged that its adherence to these standards was "a material inducement for [Lynx's] willingness to engage [Caliber] to service the Mortgage Loans on behalf of [Lynx]." *Id.* § 24.01.

---

[2] "Customary Servicing Procedures" is defined in the Agreement to mean, among other things, "the practices and procedures customarily followed by prudent mortgage banking institutions which regularly service mortgage loans of the same type as such Mortgage Loan in the ordinary course of business." Agreement § 1.01 (definitions).

## ii. Caliber Promised To Adhere To Agency Requirements And Industry Standards.

38.     Caliber further represented, warranted, and covenanted to Lynx that, as of the date the Agreement was executed, and as of each date on which Lynx purchased Mortgage Loans, and "at all times" while Caliber was servicing those Mortgage Loans, "[t]he servicing of each Mortgage Loan complies with Applicable Law, Customary Servicing Procedures, applicable Agency Requirements, and this Agreement." Agreement § 6.02(e).  Section 24.01(a) also provided that, at all times during the term of the Agreement, Caliber would service the Mortgage Loans "in compliance with all Applicable Laws and all applicable Agency Requirements" as well as "in accordance with the terms of this Agreement and the terms of the Mortgage Loan Documents." *Id.* § 24.01(a).  The term "Agency Requirements" is defined in the Agreement to mean, among other things, "any agreements, arrangement, or contracts, . . . or any announcements, bulletins, circulars, directives, guides, handbooks, instructions, manuals, notices, policies, practices, procedures, regulations, rules, or similar materials," issued by FHA, HUD, RD (a division of USDA), or VA and to which the Mortgage Loans were at any point subject.  *Id*.

39.     Importantly, FHA Mortgage Loans and VA Mortgage Loans were subject to Agency Requirements that included, among others, notices issued by FHA and VA on July 23, 2021 in which those Agencies addressed the fact that numerous loans covered by their programs would be emerging from COVID-19-related forbearance in the coming months and that payments would again become due following the close of the forbearance period.  FHA Mortgage Loans and VA Mortgage Loans were also subject to separate FHA and VA directives (discussed above)

11

expressly requiring that modifications of any nonperforming loans exiting forbearance must be completed within 120 days of the end of the loan's forbearance period.[3]

### iii. Caliber Promise To Complete Modifications And Redeliveries Promptly.

40.     The Agreement also required Caliber to complete its activities related to repurchase and redelivery within certain timeframes.  For example, Caliber expressly agreed that it would "continuously monitor all Mortgage Loans in order to identify all (if any) Mortgage Loans that have become eligible to be delivered into a GNMA Pool" and would "promptly provide written notice" to Lynx when Mortgage Loans became eligible for redelivery.  Agreement § 24.05.  Upon Lynx's receipt of that notice, and Lynx's offer to sell those Mortgage Loans to Caliber so they could be redelivered, each such sale was required to be "effectuated on the earliest possible Business Day that is mutually acceptable to both Parties, but not later than the first GNMA pooling date immediately following the date on which the Seller received the related Reperforming Mortgage Loan Repurchase Notice."  The Agreement dictated that "time" was "of the essence" for redelivery of reperforming Mortgage Loans into GNMA Pools.  *Id.* § 24.05.

41.     Acknowledging the importance of meeting these performance standards, Caliber made representations, warranties, and covenants to Lynx in the Agreement regarding Caliber's capacity to perform all of its obligations with the requisite speed.  Unfortunately for Lynx, many of these have proven false.  For example, Caliber expressly represented, warranted, and covenanted in Agreement Subsection 6.02(f) that, as of the date the Agreement was executed, and as of each date on which Lynx purchased any Mortgage Loans, and "at all times" while Caliber was servicing

---

[3]    HUD Mortgagee Letter 2021-18: COVID-19 Recovery Loss Mitigation Options. July 23, 2021; VA Circular 26-21-13: COVID-19 Home Retention Waterfall and COVID-19 Refund Modification. July 23, 2021.

those Mortgage Loans, Caliber "[did] not believe, nor [did] it have any reason or cause to believe, that it [could not] perform each and every covenant contained in th[e] Agreement." As described above and further below, one of Caliber's most critical covenants was "to preserve and maximize the value of each Mortgage Loan." *Id.* § 24.01(b). Through Subsection 6.02(f), Caliber restated and reaffirmed to Lynx—each and every day that Caliber was servicing the Mortgage Loans—that Caliber believed that it could maximize the value of each Mortgage Loan.

### iv.  Caliber's Promise To Provide Complete And Accurate Information About Lynx's Loans.

42.     Caliber also expressly represented, warranted, and covenanted in Agreement Subsection 6.02(k) that, as of the date the Agreement was executed, as of each date on which Lynx purchased any Mortgage Loans, and "at all times" while Caliber was servicing those Mortgage Loans, "[a]ll statements, reports and other documents furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby, when taken as a whole, are true and complete in all material respects and do not omit to disclose any material facts necessary to make the statements therein, in light of the circumstances in which they are made, not materially misleading." Agreement § 6.02(k). These commitments were critical to Lynx, which had to (and justifiably did) rely on the information Caliber provided to Lynx in making its decisions about the Mortgage Loans.

43.     To ensure that Caliber maintained adequate records, Lynx also secured information rights through the covenants in Section 6.09(b), which provided that:

> "[T]he Seller shall, upon reasonable request of the Purchaser, provide information and documentation relevant to the Seller and its origination and sale practices and procedures and with respect to servicing, including description of the Seller's servicing facilities, experience, size and composition and delinquency information of servicing portfolio, general servicing processes and procedures (including handling delinquencies, losses, charge-offs, loss mitigation and foreclosure and work-out), information about relevant pending litigation or enforcement activities involving the Seller and such other

13

information related to the Seller or its performance hereunder. The Seller shall, upon reasonable request of the Purchaser, promptly deliver to the Purchaser a copy of such records or information requested by the Purchaser that are related to a Mortgage Loan to the extent that such records or information is not in the Purchaser's or any of its agent's possession."

(Agreement § 6.09(b).)

44.    Mortgage servicers are expected to rigorously document their activities and maintain accurate, up-to-date internal records of the type called for in Section 6.09(b) related to all of the loans they service.  This is not just industry practice; like all mortgage servicers, Caliber was required by federal law, commonly known as Regulation X, to maintain policies and procedures.  *See* 12 CFR § 1024.38.  In the Agreement, Caliber promised it would comply with Regulation X and all Applicable Requirements.  (Agreement § 6.02(e).)  Specifically, Regulation X provides that "[a] servicer shall maintain policies and procedures that are reasonably designed to achieve the objectives," including "[p]rovid[ing] owners or assignees of mortgage loans with accurate and current information and documents about all mortgage loans they own" and "[p]roperly evaluat[ing] a borrower who submits an application for a loss mitigation  option[.]"

45.    A servicer failing to document its activities and maintain continuously updated records would expose itself to potential legal liability, potentially impair the enforceability of the affected loans, and fall far short of customary standards in the industry and the requirements of Regulation X.  By representing that its servicing of the Mortgage Loans complied with agency requirements, industry standards, and the requirements of Section 6.09(b), Caliber thus represented that it would engage in adequate and accurate recordkeeping.

    **c.**       **Lynx's Remedies For Caliber's Breach Of Its Representations, Warranties, And Covenants.**

46.    In the event Caliber breached any of its representations or warranties in Subsections 6.01 or 6.02 of the Agreement, the parties agreed in Subsection 6.04(b) of the Agreement that

14

Lynx would be entitled to demand either, (i) for Mortgage Loans then owned by Lynx, that Caliber repurchase impacted Mortgage Loans for the "Repurchase Price," which is defined by a specific formula set forth in the Agreement, or (ii) for Mortgage Loans previously sold by Lynx and then redelivered into GNMA pools, that Caliber pay Lynx damages pursuant to Subsection 6.04(b) of the Agreement.[4]

47.    Subsection 6.05(a) provides Lynx with an additional and independent remedy for losses caused by Caliber.  In the event Caliber breaches any of its representations, warranties, or covenants in Subsection 6.01 or 6.02 of the Agreement (or, for that matter, any other provision in the Agreement), Subsection 6.05(a) of the Agreement entitles Lynx to demand indemnification and reimbursement from Caliber, including the following:

> In addition to the cure, repurchase, and other obligations imposed upon the [Caliber] pursuant to this Agreement or otherwise at law or in equity, [Caliber] also shall indemnify and hold harmless [Lynx] and its successors and assigns against, and shall reimburse [Lynx] for, any and all out-of-pocket costs, damages, expenses, fees (including reasonable attorneys' fees incurred in connection with the enforcement of [Caliber]'s repurchase, indemnification, and other obligations hereunder), fines, penalties, forfeitures, judgments, liabilities, and other losses (collectively, "Losses") resulting from any claim, defense, demand, or assertion arising from or relating to (i) the breach, in any material respects, by [Caliber] of its representations or warranties in this Agreement, (ii) the non-fulfillment, in any material respects, by [Caliber] of its agreements, covenants, obligations, or other undertakings in this Agreement, (iii) any Delivery Failure relating to any Mortgage Loan, or (iv) any Uncovered Losses relating to any Mortgage Loan . . . . This indemnification provision expressly includes both third party claims and claims between the parties.

---

[4]  The Agreement defines the term "Repurchase Price" to mean, with respect to any particular Mortgage Loan, "the sum of (a) the product of the Unpaid Principal Balance of such Mortgage Loan as of the date that is one (1) day prior to the Repurchase Date, multiplied by the Purchase Price Percentage, plus (b) all unpaid interest that accrued in connection with such Mortgage Loan at the Mortgage Interest Rate from the date of the last paid installment through the date that is one (1) day prior to the Repurchase Date, plus (c) all unrecovered Escrow Advances paid or reimbursed by [Lynx] to [Caliber] in connection with the Mortgage Loan through the date that is one (1) day prior to the Repurchase Date, plus (d) all out-of-pocket costs, expenses, and fees (including attorneys' fees and servicing fees) and other losses incurred or sustained by [Lynx] in connection with the purchase, servicing, and repurchase of such Mortgage Loan."  Agreement § 1.01 (definitions).

*Id.* § 6.05(a).

48.     And in the event Caliber refuses to repurchase any Mortgage Loan in accordance with Subsection 6.04(b) or fails to indemnify Lynx for any Losses in accordance with Subsection 6.05(a), then Subsection 6.06(a) of the Agreement expressly provides that Lynx "shall be entitled to pursue all other remedies available to [Lynx] at law or in equity." *Id.* § 6.06(a). Lynx is not required to invoke these remedies in any particular order, or subject to any particular process, as Caliber expressly acknowledged in the Agreement that "all rights and remedies conferred upon [Lynx] pursuant to this Agreement are (A) exercisable by [Lynx] at its election, at any time, and in any order determined by [Lynx] in its sole discretion, and (B) cumulative of all other rights and remedies otherwise available to [Lynx] at law or in equity." *Id.* § 6.06(b).

49.     The remedies available to Lynx include, in addition to those discussed above, indemnification and litigation expenses and fees. Subsection 6.05(a) independently entitles Lynx to indemnification for "any and all" fees and expenses it incurs in connection with litigation arising from or relating to Caliber's breaches of the Agreement. Lynx also has the right to recover "all costs, expenses, and fees (including attorneys' fees)" should it be the "prevailing party" in any litigation related to the Agreement. Agreement § 6.07.

**d.       The Agreement Sets Forth A Procedure For Transferring And Valuing The Mortgage Servicing Rights.**

50.     In the event Caliber stops being the servicer, the Agreement has a process for Caliber to transfer the Mortgage Servicing Rights ("MSRs") to an appropriate replacement servicer.

51.     Under Sections 24.12(b) and 24.15 of the Agreement, in such circumstances, Lynx is to engage a third party to value the MSRs.

16

52.     The value of the MSRs could be either positive, meaning Lynx would have to pay Caliber, or negative, meaning Caliber would have to pay Lynx.

## III.     CALIBER BREACHES BY FAILING TO SERVICE THE MORTGAGE LOANS AS PROMISED.

### a.     Caliber's Operations Were Severely Compromised By A Merger And Servicing Systems Transition.

53.     In total, Lynx purchased $1.769 billion in Mortgage Loans pursuant to the Agreement, in two separate transactions that closed on July 1, 2021, and August 2, 2021. Shortly thereafter, Caliber's servicing operations underwent fundamental changes that rendered Caliber unable to live up to its promises under the Agreement.

54.     Immediately following the Lynx deals, New Residential Investment Corp. acquired Caliber, in August 2021. Due to that acquisition, Caliber lost key servicing personnel, leaving Caliber's servicing team without expertise and resources necessary to service the loans in compliance with the Agreement.

55.     In addition, Caliber experienced significant problems in October 2021 due to a decision to transfer its servicing software and data management system from one third-party provider to another. These problems directly impacted Caliber's loss mitigation activities, including (but not limited to) Caliber's ability to process Mortgage Loan modifications.

56.     The reports Lynx received from Caliber at the time hinted at the scope of these issues, but did not make clear what was happening behind the scenes, or how severely Caliber had compromised its ability to meet its obligations in the Agreement. For instance, in October 2021, Caliber reported to Lynx that it had approximately $636 million of Mortgage Loans with in-progress modifications. The very next month, in November 2021, however, Caliber reported *zero* Mortgage Loans with in-progress modifications. In December 2021, Caliber reported $42 million of Mortgage Loans with in-progress modifications. These two months' modification numbers

were dramatically lower than prior activity, and much lower than one would expect for loan pools of this size and type.

57.    On January 10, 2022, Caliber's Vice President of Investor Servicing informed Lynx that:

> During the last 8 weeks, immediately after our servicing platform transition to MSP [Black Knight] *we experienced a decrease in volume* based on unexpected/unprecedented staffing demands (Covid, EOY etc.), elongated processing timelines (4 days vs 2 days), and *reporting challenges related to the new system*. To offset these items over the last few weeks and into the future we are supplementing staffing having moved additional FTE (>25%) from a variety of other teams in our loss mitigation U/W and processing areas in order to address the backlog which developed and get back to steady state in the impacted areas. Additionally, we have employed additional resources to work through some of *the operational reporting delays that have hindered our automation processes.*

(emphasis added). Upon information and belief, Caliber offered these excuses that its servicing delays were caused by exogenous and temporary challenges, and claimed that the company had already addressed the issues, in order to mask the deeper, structural issues arising out of its acquisition and its servicing platform transition that Caliber knew were causing ongoing problems.

**b.     Caliber's Operational Failures Caused It To Breach The Agreement.**

**i.   Caliber Modified Loans Far Too Slowly.**

58.    What Lynx knows now is that Caliber experienced undisclosed issues with the pace and quality of its servicing of Lynx's loans far earlier than January 2022, and the issues continued thereafter. Once Mortgage Loans began coming out of forbearance in September and October 2021, Caliber did not modify them at the pace (*i.e.,* within the timelines) mandated by applicable

Agency Requirements, such as the FHA and VA notices referenced above. *See supra* ¶ 39 & FN 3.[5]

59.    By failing to complete Mortgage Loan modifications and redeliveries in a timely manner, Caliber breached various of its representations, warranties, and covenants, including those committing Caliber to: (i) service the loans in compliance with Agency Requirements, Customary Servicing Procedures; (ii) take all actions necessary to preserve and maximize the value of each Mortgage Loans; and (iii) refrain from any action that would have a material adverse effect upon the value of the Loans.

60.    These breaches caused Lynx significant economic harm because, as interest rates continued to rise in the marketplace, the modification rates Caliber offered to borrowers fell farther and farther out of step with prevailing market interest rates by the time Lynx could sell the Mortgage Loans back into GNMA pools.

61.    For example, a loan that came off of forbearance in September 2021 should have had its modification completed by December 2021; yet, Caliber may have approved a rate in fall 2021, then lagged several more weeks or months past December 2021 in completing the modification such that the Mortgage Loan was ready for redelivery. This then caused the approved modification rate to fall farther out of step with fast-rising prevailing market rates. Overall, Caliber

---

[5]    Indeed, a HUD/Office of Inspector General (OIG) audit found that servicers failed to provide proper loss mitigation assistance to delinquent borrowers after their COVID-19 forbearance ended, including failing to complete a loss mitigation action for borrowers who were on a COVID-19 forbearance within 120 days from the end of forbearance as required by HUD's guidance. *See* OFFICE OF INSPECTOR GENERAL, COVID-19 Loss Mitigation Office of Single Family Housing, 2023-KC-0005 (June 13, 2023), https://www.hudoig.gov/sites/default/files/2023-06/2023-KC-0005.pdf at 3, 10.

processed modifications slower, and at lower rates, than it had committed it would, ultimately causing the loans to fetch lower prices than they otherwise would have in a rising rate environment.

62.    Based on an initial review of available information, numerous loans were not modified within the timelines mandated by applicable Agency Requirements and/or industry standards, resulting in those loans being sold at a price lower than expected had Caliber complied with all timelines.

63.    Caliber also failed to notify Lynx promptly, as required by Section 24.05 of the Agreement, when Mortgage Loans were eligible for redelivery, thus delaying the redelivery timelines, and compounding the impact on the value of the loans stemming from Caliber's other failures.  For some loans, Caliber waited so long after their reperformance that the borrower slipped into delinquency again, rendering the loans ineligible for redelivery and denying Lynx its securitization premium.

64.    These delays meant that when Caliber was finally able to redeliver the Reperforming Mortgage Loans, there was a wide disparity between the lower interest rates on the languishing Reperforming Mortgage Loans and the much higher then-prevailing market rates on more recently modified mortgage loans.  Moreover, Lynx continued to bear the burden of any negative performance in the loans that Caliber serviced each day those loans were undergoing modification beyond the timelines established by Applicable Requirements and Customary Servicing Procedures.

### ii.  Caliber Modified Loans In Ways That Did Not Maximize Their Value.

65.    Caliber also breached the Agreement by completing modifications using rates that failed to "take or cause to be taken all actions necessary or appropriate to preserve and maximize the value of each Mortgage Loan."  Agreement § 24.01.  Caliber had specifically covenanted (and

represented its ability to honor its covenant) to maximize the value of each loan; yet time and again its loss mitigation team chose modifications that failed to do so.

66.    For example, one way to maximize the value of a distressed Mortgage Loan is to rely upon government assistance programs that reimburse servicers for subordinating the existing debt on a mortgage to a second lien. This mechanism is known as a "partial claim." Mortgage servicers can use partial claims to return the loan to a performing status while modifying the loan to a higher rate, while reducing the monthly payment for the borrower. The higher rate ensures a greater resecuritization premium for the investor in Lynx's position.

67.    Yet Caliber failed to leverage partial claims to the greatest extent that would have benefitted Lynx. In hundreds of cases, Caliber instead offered borrowers lower rates than it could have had it used the partial claim mechanism to its fullest extent. This practice resulted in Caliber failing to modify Mortgage Loans at appropriate rates that "maximize[d] value," in material breach of its covenant to maximize the value of the loans.

68.    Caliber's failure to maximize value harmed Lynx in various ways, including by lowering the monthly payments borrowers would pay to Lynx, and also by lowering the price of the loans Lynx could obtain upon resecuritization. And while Lynx was losing out on value as a result of these lower monthly payments, Caliber was still collecting its servicing fees.

**c.    Caliber Terminated Itself As Loan Servicer, But Refused To Compensate Lynx For The Servicing Rights Value.**

69.    On November 18, 2022, Caliber notified Lynx that it was terminating its servicing duties pursuant to Section 24.12(b) of the Agreement.

70.    As a result of Caliber's termination, Section 24.12(b) provides a mechanism for Lynx to select a "leading dealer in the mortgage servicing market that is not affiliated with" Lynx or Caliber "to determine the amount (the 'Servicing Value')." *Id.* § 24.12(b). "If that amount is a

positive number, the Purchaser shall pay [the Servicing Value] to the Seller, and if it is a negative number, the Seller shall pay [the Servicing Value] to the Purchaser." *Id.*

71.     In accordance with these provisions, Lynx engaged Situs AMC, LLC ("Situs") to determine the Servicing Value.

72.     On February 23, 2023, Situs completed its valuation based on a reasonable, good faith analysis consistent with that required and determined the Servicing Value to be negative $2,161,656.  In March 2023, Caliber received Situs' written computation showing its calculation. Consequently, pursuant to Section 24.12(b) of the Agreement, Caliber is required to remit this quantity to Lynx.

73.     Yet Caliber has refused to pay anything for the Servicing Rights Transfer, despite its clear contractual obligation to do so.

> **d.       Caliber's Actions Breached The Agreement And Materially Devalued The Mortgage Loans And Lynx's Interests Therein.**

74.     Caliber's actions detailed above did the opposite of maximizing the value of Lynx's Mortgage Loans, as Caliber had promised to do: they caused Lynx to lose tens of millions of dollars.

75.     Caliber's actions breached the Agreement in a variety of ways.  In modifying loans and preparing them for redelivery too slowly and modifying at rates lower than were achievable, Caliber at least breached its covenants "to preserve and maximize the value of each Mortgage Loan" and also to maximize "the ability and eligibility of each Mortgage Loan to be delivered into GNMA Pools for securitization into a GNMA MBS," Agreement § 24.01(b); "to perform the administration, collection, and servicing of each Mortgage Loan . . . in compliance with all Applicable Laws and all applicable Agency Requirements [and] in a manner consistent with all Customary Servicing Procedures, but in no event with any less than the same degree of care,

22

diligence, and prudence that the Seller uses when servicing mortgage loans of the same type as the Mortgage Loan for the Seller's own account," *id.* § 24.01(a); to not "take or cause to be taken any action that would have a material adverse effect upon the value of any Mortgage Loan," *id.* § 24.01(c); and to "perform all loan . . .servicing functions with respect to the Mortgage Loans on behalf of, for the benefit of and in the best interest of [Lynx]," *id.* § 24.03.

76.     Caliber also breached its representation and warranty that, as of every day it serviced the Mortgage Loans, it "[did] not believe, nor [did] it have any reason or cause to believe, that it [could not] perform each and every covenant contained in th[e] Agreement."  *Id.* § 6.02(f). Caliber knew its new servicing software and personnel issues were contributing to a fundamental inability to maximize the value of the loans in conformance with of its obligations under the Agreement.  Yet Caliber ignored those red flags.

77.     Caliber's grievous servicing problems are further illustrated by comparing its modification performance to that of its parent company (New Residential, now known as Rithm Capital) as well as the modification performance of other servicers.  During the relevant period, the average interest rate at which Caliber set loan modifications was significantly below the average rate set by its parent company, New Residential.  In addition, the coupon rates of Caliber's redelivered loans were significantly lower than those of its parent company.  New Residential's modification rates and coupon rates received upon redelivery demonstrate that Caliber failed (i) to maximize the value of the loans, and (ii) to modify the loans purchased by Lynx with "the same degree of care, diligence, and prudence that the Seller uses when servicing mortgage loans of the same type as the Mortgage Loan for the Seller's own account," thereby breaching at least two of its covenants in Section 24.01.  Furthermore, Caliber had reason to believe it was unable to honor either of those Section 24.01 covenants in light of the superior servicing operation run by its parent,

New Residential, which amounts to a breach of its representation and warranty in Section 6.02(f), in which it claimed it had no reason to doubt its ability to perform the covenants under the Agreement.

78.     This discrepancy between Caliber and New Residential is particularly troubling when one considers Caliber's perverse economic incentives related to its modification activity. When Caliber redelivers formerly-Lynx-owned Mortgage Loans at a subpar coupon rate, not only is Caliber not harmed, Caliber actually benefits.  Lower interest rate loans remain outstanding relatively longer and therefore the average time period during which Caliber will receive fees for servicing the lower-rate loans is longer.  This contrasts with the incentives of servicers who own the loans they are servicing, such as Caliber's parent company New Residential.  Such servicers are incentivized to seek higher interest rates on modified loans because the benefit of redelivering such loans at higher MBS prices outweighs the benefit of servicing the loans for longer periods.

79.     This incentive structure is one of the reasons why Lynx required Caliber to make the covenants reflected in Sections 24.01 and 24.02 and also to represent and warrant that it believed it would be able to satisfy those covenants, and even to further recommit to some as independent representations and warranties, in Section 6.02.

80.     Due to Caliber's servicing failures, Caliber ultimately redelivered loans to GNMA pools at below-market prices, causing declines in the value of the loans, to the detriment of Lynx and in breach of multiple of Caliber's covenants.  Lynx suffered damages, *inter alia,* based on the difference between the price received for the loans and the price Lynx should have realized absent Caliber's breaches.

24

81. For several months, Lynx tried to get help from Caliber to resolve some of the most readily apparent issues with Caliber's servicing without resorting to litigation. But Caliber did not cooperate when Lynx made requests for information at the business-to-business level.

82. On September 9, 2022, Lynx requested that Caliber allow Lynx to inspect and examine relevant books and records, and provide relevant reports, information, and documentation, all in conformity with Caliber's obligations under the Agreement. However, Caliber refused to provide access for an audit or to provide the relevant reports, in further breach of the Agreement, responding that it was only required to respond to "reasonable" requests for information.

83. On June 20, 2024, Lynx asked Caliber to accordingly produce at least the set of documents it deemed responsive to Lynx's September 2022 requests. As of this date, it has yet to produce any documents in response to Lynx's requests.

## IV. LYNX EXECUTES LOAN TRANSFERS BUT RETAINS STANDING FOR ALL CLAIMS.

84. Like other financial instruments, EBO loans may be bought and sold between multiple investors. These loan transactions ensure that funds continue flowing from investors to lenders to borrowers, fueling the housing market. The ability to transfer loans from one investor to another is quintessential to keeping this process running smoothly.

85. The Agreement gave Lynx the right to transfer the loans that it purchased from Caliber to another investor, and it required Caliber to consent to that agreement at Lynx's "sole

option." Agreement § 11. The Agreement further required Caliber to cooperate fully with the transfer of loans. *Id.*

86.    Nothing in the Agreement permitted Caliber to alter its duties following a transfer; all its binding representations and warranties remain in effect irrespective of whether Lynx, or an assignee, held the loans. Agreement § 21.

87.    In 2021, Lynx began contemplating a transfer of the loans it purchased from Caliber, in accordance with the provisions of Section 10. Lynx informed Caliber that it intended to transfer the loans and proposed, consistent with Section 10, an Assignment, Assumption, and Recognition Agreement ("AARA") to NexBank to effectuate the transfer.

88.    The Assignment, Assumption, and Recognition Agreement assigned Lynx's right to proceeds from the Mortgage Loans, and transferred Lynx's obligations, including payment of servicing fees, under the Agreement to NexBank; but not, as Lynx and NexBank understood, any of Lynx's claims related to the Mortgage Loans. In each AARA, Caliber restated all of its representations and warranties as originally set forth in Subsection 6.02 and Section 6.01 clauses (bb), (cc), (dd), and (ee) of the Agreement.

89.    In total, Lynx transferred 7,349 loans representing $1,725,573,075.56 in unpaid principal balance to NexBank through AARAs signed on July 23, 2021; August 31, 2021; February 11, 2022; March 15, 2022; and October 7, 2022.

90.    Lynx and NexBank executed a Participation Agreement ("PA") that established the financial rights of both parties in connection with each AARA. Under each Participation Agreement, Lynx maintained a financial interest—and a financial risk—in the performance of the loans, as impacted by Caliber's servicing activities. Lynx and NexBank executed five Participation Agreements concurrently with the AARA: July 23, 2021, August 31, 2021, February

11, 2022, March 15, 2022, and October 7, 2022.  These Participation Agreements encompassed all loans transferred to NexBank by Lynx.

91.    Despite Lynx and NexBank's mutual understanding that Lynx retains rights to assert any legal claims on the loans, and that the parties never intended for Lynx or NexBank to assign such claims to NexBank pursuant to the AARAs, after Caliber raised the notion that Lynx lacked standing to bring claims related to the loans, NexBank and Lynx agreed to execute an assignment of claims related to the loans NexBank had purchased from Lynx.

92.    Therefore, on May 2, 2024, NexBank and Lynx executed an AARA that assigned to Lynx all of NexBank's right, title and interest to certain Mortgage Loans identified on a Schedule I, attached hereto.  (Ex. E, § 1; Schedule I.)  Alongside this AARA, NexBank and Lynx executed a Claim Assignment and Assumption Agreement ("Claim Assignment") that assigned to Lynx "Assumed Claims"—that is, all claims accruing prior to the date of the Claim Assignment "that NexBank has or may have against Caliber, whether known or unknown, and directly or indirectly arising out of, based upon, relating to, or resulting from, in whole or in part, Caliber's breach of the MLPSSA with respect to any of the Assigned Loans."  (Ex. F, Claim Assignment § 1.1(c).)

93.    Pursuant to the Claim Assignment, NexBank "assign[ed], grant[ed], transfer[red] and convey[ed] to Lynx all of Nexbank's rights, title, and interest in, to, and under each of the Assumed Claims, including without limitation those remedies identified in Subsections 6.04, 6.05, and 6.07 of the MLPSSA with respect to the Assigned Loans or the Assumed Claims."  (*Id.* § 2.1.)

V.    **CALIBER DENIES LYNX INFORMATION AND FORCES LYNX TO SEEK JUDICIAL RELIEF.**

94.    On July 25, 2023, Lynx notified Caliber of its breaches and included in its notification a list of each of the loans as to which Lynx had concluded, based on the information

available to it, that Lynx is entitled to damages pursuant to Subsection 6.04(b), as well as the amount due on account of the Servicing Rights Valuation.

95.   Lynx renewed its demands on June 20, 2024.  Lynx notified Caliber of its breaches and included in its notification a list of each of the loans as to which Lynx had concluded, based on the  information currently available to it, that Lynx is entitled to damages pursuant to Subsection 6.04(b).  On July 22, 2024, Caliber flatly refused to accede to any of these demands.

96.   Lynx renewed its demands once again on January 30, 2025, again outlining each of Caliber's breaches, and including a list of each impacted loan and the damages owed by Caliber under Subsection 6.04(b).

97.    Caliber still refused to pay.  Consequently, Lynx now seeks judicial relief.

### FIRST CAUSE OF ACTION
**(Breach of Contract—Loan Servicing)**

98.   All of the allegations set forth in paragraphs 1 through 97 are realleged and incorporated as if fully stated herein.

99.   The actions described above constituted breaches of Caliber's covenants, including but not limited to: (i) Caliber's promise under Section 24.01(a)(iii) to "perform the . . . servicing of each Mortgage Loan . . . in a manner consistent with all Customary Servicing Procedures, but in no event with any less than the same degree of care, diligence, and prudence that the Seller uses when servicing mortgage loans of the same type as the Mortgage Loan for the Seller's own account;" (ii) Caliber's promise under Section 24.01(b) to "take or cause to be taken all actions necessary or appropriate to preserve and maximize the value of each Mortgage Loan and . . . the ability and eligibility of each Mortgage Loan to be delivered into GNMA Pools for securitization into a GNMA MBS"; (iii) Caliber's promise to "take all actions necessary and appropriate to preserve and maximize the value of each  Mortgage Loan," as required under Section 24.02(b);

(iv) Caliber's promise under Section 24.02(a) to "perform the . . . servicing of each Mortgage Loan . . . in compliance with all Applicable Laws and all applicable Agency Requirements" and "in a manner consistent with all Customary Servicing Procedures;" (v) Caliber's promise under Section 24.02(c) to "not take or cause to be taken any action that would have a material adverse effect upon the value of the Mortgage Loans;" and (vi) Caliber's promise under Section 24.03 to "perform all loan . . .servicing functions with respect to the Mortgage Loans on behalf of, for the benefit of and in the best interest of [Lynx]."

100.    The Agreement is a valid and enforceable contract and Caliber has never suggested otherwise.  Lynx fully performed all of its obligations under the Agreement.

101.    Subsection 6.04(b) of the Agreement provides that, upon Lynx's discovery "of a breach of any of [Caliber's] representations and warranties" that "materially and adversely affects" the value of a Mortgage Loan or Lynx's "interest therein," and where such breach "is of a type that reasonably could not be expected to be cured," Caliber must promptly "repurchase the related Mortgage Loan at the applicable Repurchase Price" within 10 days.  Lynx's "assignment or sale of any Mortgage Loan to a third-party" does "not extinguish [Lynx's] right to seek recourse against [Caliber] pursuant to this Subsection 6.04 or otherwise."  *Id.*

102.    Caliber's aforementioned misconduct and failings breached its representations and warranties in the Agreement in several ways, including but not limited to:  (i) Caliber's representation and warranty in Section 6.02(e) that "[t]he servicing of each Mortgage Loan complies with Applicable Law, Customary Servicing Procedures, applicable Agency Requirements, and this Agreement;" and (ii) Caliber's representation and warranty in Section 6.02(f) that it "does not believe, nor does it have any reason or cause to believe, that it cannot

perform each and every covenant contained in [the] Agreement," insofar as it was aware of the servicing slowdown and did not inform Lynx of the difficulties in a timely fashion.

103. Lynx has suffered damages as a result of Caliber's breaches of its representations, warranties, and covenants, and its refusal to repurchase affected Mortgage Loans, and/or its refusal to pay Lynx the amounts owed for such breaches under Subsection 6.04(b) of the Agreement. Caliber's breaches of its representations and warranties have also materially and adversely impacted the value of the Mortgage Loans, and Lynx's interest therein in multiple ways

104. These damages—and any pre- and post-judgment interest thereon—qualify as reimbursable "Losses" under Subsection 6.05(a) of the Agreement, which requires Caliber to indemnify Lynx for "any and all out-of-pocket costs, damages, expenses, fees (including reasonable attorneys' fees incurred in connection with the enforcement of the Seller's repurchase, indemnification, and other obligations hereunder), fines, penalties, forfeitures, judgments, liabilities, and other losses" resulting from a "claim, defense, demand, or assertion arising from or relating to [] the breach, in any material respects, by [Caliber] of its representations or warranties in [the] Agreement [or] the non-fulfillment, in any material respects, by [Caliber] of its agreements, covenants, obligations, or other undertakings in [the] Agreement."

105. The "Losses" Lynx suffered as a result of Caliber's breaches and material failures to carry out its obligations under the Agreement include, but are by no means limited to, the Repurchase Price for each impacted Mortgage Loan, any other Subsection 6.04(b) damages applicable, the decrease in market price for each impacted loan, and its attorneys' fees associated with this action.

106. Lynx has demanded in writing that Caliber provide redress for its failings, but Caliber has refused to do so.

**SECOND CAUSE OF ACTION**
**(Breach of Contract—Servicing Rights Valuation)**

107.    All of the allegations set forth in paragraphs 1 through 97 are realleged and incorporated as if fully stated herein.

108.    On November 18, 2022, Caliber notified Lynx that, pursuant to Section 24.12(b)(iii) of the Agreement, Caliber was electing to terminate "its servicing duties and obligations under Section 24 of the Agreement" for all Mortgage Loans Caliber was continuing to service on Lynx's behalf.  This termination triggered Caliber's obligation to "transfer the servicing of such Mortgage Loans" to a successor servicer selected by Lynx as well as Lynx's obligation to select an independent appraiser to determine the Servicing Value.  Agreement § 24.12(b).

109.    Lynx selected Situs, a leading dealer in the mortgage servicing market that is unaffiliated with either Lynx or Caliber, to determine the Servicing Value.

110.    In accordance with Section 24.12(b), Situs determined that the Servicing Value was negative $2.162 million.  This valuation fully complied with the relevant provisions of the Agreement, including Section 24.12(b).  Because the Servicing Value was calculated to be "a negative number" Caliber was required to pay to Lynx $2.162 million in connection with transferring its servicing rights.  *Id.*

111.    Lynx has demanded in writing that Caliber remit the $2.162 million it owes pursuant to Section 24.12 of the Agreement, but Caliber has refused to do so.

112.    Consequently, Lynx respectfully requests an order requiring Caliber to pay $2.162 million to Lynx pursuant to Section 24.12(b) of the Agreement.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Lynx respectfully requests that the Court enter a judgment:

31

(a)     Finding that Caliber has materially breached the Agreement, including the representations and warranties described herein;

(b)     Ordering Caliber to repurchase all Mortgage Loans presently owned by Lynx at the applicable Repurchase Price, or pay Lynx the equivalent amount in monetary damages owed under Subsection 6.04(b) for loans no longer owned by Lynx, plus pre- and post-judgment interest;

(c)     In the alternative, requiring Caliber to indemnify Lynx for the Losses it suffered within the meaning of Section 6.05(a) of the Agreement, including the resecuritization profits Lynx would have realized but for Caliber's failure to service the Mortgage Loans according to Customary Servicing Procedures, plus pre- and post-judgment interest;

(d)     Requiring Caliber to remit to Lynx $2.162 million pursuant to Section 24.12 of the Agreement, plus pre- and post-judgment interest;

(f)     Awarding damages to Lynx in an amount to be proved at trial, plus pre- and post-judgment interest;

(g)     Awarding Lynx costs, expenses, fees, and losses, including attorney's and expert fees, related to this dispute, pursuant to Sections 6.05(a) and 6.07(d) of the Agreement; and

(h)     Granting such other relief as this Court deems just and proper.

Dated: New York, New York
    April 9, 2025

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

By:    */s/ Wing F. Ng*

David M. Grable
(*pro hac vice* forthcoming)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
(213) 443-3000
davidgrable@quinnemauel.com

Emily Kapur
(*pro hac vice* forthcoming)
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
(650) 801-5000
emilykapur@quinnemanuel.com

David Cooper
(*pro hac vice* forthcoming)
Wing F. (Alex) Ng
Alex Zuckerman
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
davidcooper@quinnemanuel.com
alexng@quinnemanuel.com
alexzuckerman@quinnemanuel.com

*Attorneys for Plaintiff
Lynx Whole Loan Acquisition LLC*