UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LYNX WHOLE LOAN ACQUISITION LLC,

     *Plaintiff*,

         -against-

CALIBER HOME LOANS, INC.,

     *Defendant*.

---

CALIBER HOME LOANS, INC.

     *Counterclaim-Plaintiff*,

-against-

LYNX WHOLE LOAN ACQUISITION LLC,
and ALLIED FIRST BANK, S.B.,

     *Counterclaim-Defendants*.

---

Civil Action No. 1:25cv2948

**CALIBER HOME LOANS, INC.'S
ANSWER AND COUNTERCLAIMS**

---

## ANSWER

Defendant and Counterclaim-Plaintiff Caliber Home Loans, Inc. ("Caliber") submits this Answer to the Complaint filed by Plaintiff and Counterclaim-Defendant Lynx Whole Loan Acquisition LLC ("Lynx") on April 9, 2025, in the above-captioned matter.

Except as otherwise expressly admitted in this Answer, Caliber denies each and every allegation contained in the Complaint. The section headings and sub-headings used in the Complaint are repeated in this Answer solely as a matter of convenience. Caliber does not interpret the headings and sub-headings throughout the Complaint as allegations of fact to which any response is required and their repetition in this Answers does not constitute an admission. To the

extent a response is deemed required, Caliber denies all purported allegations in the headings and sub-headings in the Complaint.  Unless otherwise defined, capitalized terms shall refer to the capitalized terms defined in the Complaint; but such use is not an acknowledgment or admission of any characterization or allegation that Lynx may ascribe to the defined terms.  Caliber reserves the right to amend or supplement this Answer consistent with the Federal Rules of Civil Procedure and the rules of this Court.

## NATURE OF THE CASE

1.      Caliber denies the allegations in Paragraph 1, except it admits that Caliber and Lynx entered into a Mortgage Loan Purchase, Sale, and Servicing Agreement on December 30, 2020, that was twice amended on April 29, 2021, and July 1, 2021.

2.      Caliber denies the allegations in Paragraph 2, except that Caliber admits Lynx purchased $1.769 billion in EBO Mortgage Loans from Caliber.

3.      To the extent that the allegations in Paragraph 3 purport to characterize the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to that document for its complete and actual contents.

4.      To the extent that the allegations in Paragraph 4 purport to characterize the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to that document for its complete and actual contents.

5.      Caliber denies the allegations in Paragraph 5.

6.      Caliber denies the allegations in Paragraph 6, except Caliber admits that the U.S. Department of Housing and Urban Development and the Department of Veterans Affairs have issued guidance related to the servicing of loans underwritten in accordance with their respective guidelines.

7.      Caliber denies the allegations in Paragraph 7.

8.      Caliber denies the allegations in Paragraph 8, except that Caliber admits it resigned as servicer of the Mortgage Loans in November 2022.

9.      Caliber denies the allegations in the first sentence of Paragraph 9.  The allegations in the second, third and fourth sentences of Paragraph 9 purport to state legal conclusions to which no response is required, and to the extent they purport to characterize the Agreement, that is a document that speaks for itself.  To the extent a response is otherwise required, Caliber denies the allegations in the second, third, and fourth sentences of Paragraph 9.

10.     Caliber denies the allegations in Paragraph 10, except Caliber admits there was written correspondence from between Lynx and Caliber concerning the Agreement on July 24, 2023.

11.     Caliber denies the allegations in Paragraph 11, except Caliber admits there was written correspondence between Lynx and Caliber on June 20, 2024 and July 22, 2024 respectively concerning the Agreement and the transactions thereunder and Caliber admits that it hired new counsel.

12.     Caliber denies the allegations in Paragraph 12, except Caliber admits there was written correspondence from Lynx to Caliber on August 19, 2024 concerning the Agreement.

13.     Caliber denies the allegations in Paragraph 13, except Caliber admits there was written correspondence from Lynx to Caliber on January 30, 2025 and March 6, 2025 concerning the Agreement.

14.     Caliber denies the allegations in Paragraph 14.

## **PARTIES**

15.     Caliber lacks knowledge or information sufficient to form a belief as to the

allegations in Paragraph 15, and on that basis denies them.

16. Caliber admits the allegations in Paragraph 16.

## PERSONAL JURISDICTION, VENUE, AND JUDICIAL ASSIGNMENT

17. The allegations in Paragraph 17 purport to state legal conclusions to which no response is required, but Caliber avers that personal jurisdiction and venue are proper in the Southern District of New York.

18. Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 18, and on that basis denies them.

## FACTS

I. **RESPONSE TO** *BACKGROUND ON MORTGAGE SERVICING AND EBO LOANS*

    a. **Response to** *Mortgage Servicer Obligations And Mortgage-Backed Securities*.

19. Caliber denies the allegations in the first sentence in Paragraph 19. Caliber admits the allegations in the second sentence of Paragraph 19.

20. Caliber admits the allegations in Paragraph 20.

21. Caliber admits the allegations in Paragraph 21.

22. Caliber admits the allegations in Paragraph 22.

23. Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 23, and on that basis denies them.

24. Caliber admits the allegations in the first sentence of Paragraph 24. Caliber lacks knowledge or information sufficient to form a belief as to the allegations in the second sentence of Paragraph 24, and on that basis denies them. Caliber admits the allegations in the third, fourth and fifth sentences of Paragraph 24.

**b.  Response to *Relationship Between EBO Loan Investors And Loan Servicers.***

25.    Caliber denies the allegations in Paragraph 25.

26.    Caliber denies the allegations in Paragraph 26.

27.    Caliber denies the allegations in Paragraph 27.

28.    Caliber denies the allegations in Paragraph 28.

**c.  Response to *Regulations Applicable To Loan Modifications Following COVID-19.***

29.    Caliber admits the allegations in Paragraph 29.

30.    Caliber denies the allegations in Paragraph 30, except the quotations from the guidelines issued by the United States Department of Housing and Urban Development (the "HUD Mortgagee Letter 2021-18") and the Department of Veterans Affairs (the "VA Circular 26-21-13: COVID-19 Home Retention Waterfall and COVID-19 Refund Modification").  To the extent that the second sentence of Paragraph 30 selectively quotes the HUD Mortgagee Letter 2021-18 and the VA Circular 26-21-13: COVID-19 Home Retention Waterfall and COVID-19 Refund Modification, those documents speak for themselves and Caliber respectfully refers the Court to those documents for their complete and actual contents.

**II.   RESPONSE TO *CALIBER PROMISED TO MAXIMIZE THE VALUE OF LOANS IT SOLD TO AND SERVICED FOR LYNX***

**a.  Response to *Caliber Agrees To Sell Mortgage Loans To Lynx And Service Those Loans.***

31.    Caliber denies the allegations in Paragraph 31.

32.    Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 32, and on that basis denies them.

33.    Caliber lacks knowledge or information sufficient to form a belief as to the

allegations in Paragraph 33, and on that basis denies them.

34.     Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 34, except admits it entered into the Agreement with Lynx on December 31, 2020, pursuant to which Lynx purchased roughly $1.769 billion in EBO Mortgage Loan from Caliber.

**b.   Response to *Caliber's Covenants, Representations, And Warranties As Servicer.***

35.     Caliber denies the allegations in Paragraph 35.

**i.   Response to *Caliber Promised To Maximize The Value Of The Loans.***

36.     To the extent that Paragraph 36 selectively quotes the Agreement, this document speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.

37.     To the extent that Paragraph 37 selectively quotes the Agreement, this document speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.

**ii.   Response to *Caliber Promised To Adhere To Agency Requirements And Industry Standards.***

38.     To the extent that Paragraph 38 selectively quotes the Agreement, this document speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.

39.     To the extent that Paragraph 39 makes representations about the guidelines issued by the FHA, and VA, these documents speak for themselves.  Caliber respectfully refers the Court to these documents for their complete and actual contents.

**iii.   Response to *Caliber Promise To Complete Modifications And Redeliveries Promptly.***

40.     To the extent that Paragraph 40 selectively quotes the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.  Caliber otherwise denies the allegations in Paragraph 40.

41.     To the extent that Paragraph 41 selectively quotes the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.  Caliber otherwise denies the allegations in Paragraph 41.

### iv. Response to *Caliber's Promise To Provide Complete And Accurate Information About Lynx's Loans.*

42.     To the extent that Paragraph 42 selectively quotes the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.  Caliber otherwise denies the allegations in Paragraph 42.

43.     To the extent that Paragraph 43 selectively quotes the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to this document for its complete and actual contents.  Caliber otherwise denies the allegations in Paragraph 43.

44.     The allegations in Paragraph 44 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies these allegations.  To the extent the allegations in Paragraph 44 purport to characterize the Agreement, this document speaks for itself and Caliber respectfully refers the Court to that document for its complete and actual contents.

45.     The allegations in Paragraph 45 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies these allegations.  To the extent the allegations in Paragraph 45 purport to characterize the Agreement, this document speaks for itself and Caliber respectfully refers the Court to that document for its complete and actual contents.

c. **Response to *Lynx's Remedies For Caliber's Breach Of Its Representations, Warranties, And Covenants.***

46. To the extent that Paragraph 46 selectively quotes the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual contents. Caliber otherwise denies the allegations in Paragraph 46.

47. To the extent that Paragraph 47 selectively quotes the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual contents. Caliber otherwise denies the allegations in Paragraph 47.

48. To the extent that Paragraph 48 selectively quotes the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual contents. Caliber otherwise denies the allegations in Paragraph 48.

49. To the extent that Paragraph 49 selectively quotes the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual contents. Caliber otherwise denies the allegations in Paragraph 49.

d. **Response to *The Agreement Sets Forth A Procedure For Transferring And Valuing The Mortgage Servicing Rights.***

50. To the extent that Paragraph 50 selectively quotes the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual contents. Caliber otherwise denies the allegations in Paragraph 50.

51. To the extent that Paragraph 51 refers to the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual contents. Caliber otherwise denies the allegations in Paragraph 51.

52. To the extent that Paragraph 52 refers to the Agreement, that is a document that speaks for itself. Caliber respectfully refers the Court to this document for its complete and actual

contents.  Caliber otherwise denies the allegations in Paragraph 52.

### III.   RESPONSE TO *CALIBER BREACHES BY FAILING TO SERVICE THE MORTGAGE LOANS AS PROMISED.*

#### a.  Response to *Caliber's Operations Were Severely Compromised By A Merger And Servicing Systems Transition.*

53.    Caliber admits the allegations in the first sentence of Paragraph 53.  Caliber denies the allegations in the second sentence of Paragraph 53.

54.    Caliber admits that New Residential Investment Corp. acquired Caliber, in August 2021.  Caliber denies the allegations in the second sentence of Paragraph 54.

55.    Caliber denies the allegations in Paragraph 55.

56.    Caliber denies the allegations in Paragraph 56.

57.    To the extent the allegations in Paragraph 57 purport to quote from portions of a January 10, 2022 statement from Caliber's Vice President of Investor Servicing, the full text of that response speaks for itself.  To the extent the allegations in Paragraph 57 purport to summarize or characterize or are inconsistent with the full text of the response, Caliber denies those allegations.

#### b.  Response to *Caliber's Operational Failures Caused It To Breach The Agreement.*
##### i.  Response to *Caliber Modified Loans Far Too Slowly.*

58.    Caliber denies the allegations in Paragraph 58.

59.    The allegations in Paragraph 59 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 59.

60.    The allegations in Paragraph 60 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations

in Paragraph 60.

61.    Caliber denies the allegations in Paragraph 61.

62.    Caliber denies the allegations in Paragraph 62.

63.    Caliber denies the allegations in Paragraph 63.

64.    Caliber denies the allegations in Paragraph 64.

> **ii.    Response to *Caliber Modified Loans In Ways That Did Not Maximize Their Value.***

65.    The allegations in Paragraph 65 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations.  To the extent that the first sentence of Paragraph 65 selectively quotes Section 24.01 of the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

66.    Caliber lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 66, and on that basis denies them.

67.    Caliber denies the allegations in Paragraph 67.

68.    Caliber denies the allegations in Paragraph 68.

> **c.    Response to *Caliber Terminated Itself As Loan Servicer, But Refused To Compensate Lynx For The Servicing Rights Value.***

69.    Caliber admits the allegations in Paragraph 69.

70.    Caliber denies the allegations in Paragraph 70. To the extent that the sentences in Paragraph 70 selectively quote Section 24.12 of the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

71.    Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 71, and on that basis denies them.

72.    Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 72, and on that basis denies them.

73.    The allegations in Paragraph 73 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 73.

      **d.  Response to *Caliber's Actions Breached The Agreement And Materially Devalued The Mortgage Loans And Lynx's Interests Therein.***

74.    Caliber denies the allegations in Paragraph 74.

75.    The allegations in Paragraph 75 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 75.  To the extent that the sentences in Paragraph 75 selectively quote Section 24 of the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

76.    The allegations in Paragraph 76 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 76.  To the extent that the sentences in Paragraph 76 selectively quote Section 6 of the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

77.    The allegations in Paragraph 77 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 77.  To the extent that the sentences in Paragraph 77 selectively quote the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

-11-

78.     Caliber denies the allegations in Paragraph 78.

79.     Caliber lacks knowledge or information sufficient to form a belief as to the allegations related to Lynx's motives, and on that basis denies the allegations in Paragraph 79.

80.     Caliber denies the allegations in Paragraph 80.

81.     Caliber denies the allegations in Paragraph 81.

82.     Caliber denies the allegations in Paragraph 82, except it admits Lynx made a written request to Caliber on September 9, 2022, for Caliber's books and records.

83.     Caliber denies the allegations in Paragraph 83, except it admits Lynx made a written request to Caliber on June 20, 2024, for Caliber's books and records.

## IV.     RESPONSE TO *LYNX EXECUTES LOAN TRANSFERS BUT RETAINS STANDING FOR ALL CLAIMS*

84.     Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 84, and on that basis denies them.

85.     The allegations in Paragraph 85 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 85.  To the extent that the sentences in Paragraph 85 selectively quote the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

86.     The allegations in Paragraph 86 purport to state legal conclusions to which no response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 86.

87.     Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 87, and on that basis denies them.

88.     The allegations in Paragraph 88 purport to state legal conclusions to which no

response is required.  To the extent a response is otherwise required, Caliber denies the allegations in Paragraph 88.

89.     Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 89, and on that basis denies them.

90.     Caliber lacks knowledge or information sufficient to form a belief as to the Participation Agreements executed by Lynx and NexBank to which Caliber was not a party, and on that basis denies the allegations in Paragraph 90.

91.     Caliber lacks knowledge or information sufficient to form a belief as to the "mutual understanding" between Lynx and NexBank, and on that basis denies the allegations in Paragraph 91.

92.     Caliber lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 92 and on that basis denies them.

93.     Caliber lacks knowledge or information sufficient to form a belief as to the Claim Assignment executed by Lynx and NexBank to which Caliber was not a party, and on that basis denies the allegations in Paragraph 93.

**V.     RESPONSE TO *CALIBER DENIES LYNX INFORMATION AND FORCES LYNX TO SEEK JUDICIAL RELIEF***

94.     The allegations in Paragraph 94 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

95.     The allegations in Paragraph 95 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

96.     The allegations in Paragraph 96 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

97.     The allegations in Paragraph 97 state legal conclusions to which no response is

required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

**FIRST CAUSE OF ACTION**

98.     Caliber incorporates by reference its responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

99.     The allegations in Paragraph 99 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

100.     The allegations in Paragraph 100 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

101.     The allegations in Paragraph 101 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.  To the extent that the sentences in Paragraph 101 selectively quote the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

102.     The allegations in Paragraph 102 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.  To the extent that the sentences in Paragraph 102 selectively quote the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

103.     The allegations in Paragraph 103 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

104.     The allegations in Paragraph 104 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.  To the extent that the sentences in Paragraph 104 selectively quote the Agreement, that is a document

that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents.

105.    The allegations in Paragraph 105 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

106.    The allegations in Paragraph 104 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

**SECOND CAUSE OF ACTION**

107.    Caliber incorporates by reference its responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

108.    To the extent that the sentences in Paragraph 108 selectively quote the Agreement, that is a document that speaks for itself.  Caliber respectfully refers the Court to the Agreement for its complete and actual contents. Caliber denies the allegations in Paragraph 108.

109.    Caliber lacks knowledge or information sufficient to form a belief as to the allegations in this paragraph, and on that basis denies them.

110.    The allegations in Paragraph 110 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph.

111.    The allegations in Paragraph 104 state legal conclusions to which no response is required.  To the extent a response is required, Caliber denies the allegations in this paragraph

112.    Caliber denies the allegations in Paragraph 112.

**REQUEST FOR RELIEF**

Caliber denies that Plaintiff is entitled to any relief, including but not limited to the relief sought in the section of the Complaint titled "Request for Relief."  To the extent that this section contains any allegations requiring a response, Caliber denies them.

**<u>AFFIRMATIVE DEFENSES</u>**

Caliber asserts the following defenses to the Complaint and reserves its rights to modify and supplement these defenses, including asserting other and additional defenses, cross-claims, and third-party claims not asserted herein as may be appropriate at a later time.  In asserting these defenses, Caliber does not assume any burden of proof, persuasion, or production that is not otherwise established by applicable law.

<u>FIRST AFFIRMATIVE DEFENSE</u>

Lynx fails to state a claim against Caliber upon which relief may be granted.

<u>SECOND AFFIRMATIVE DEFENSE</u>

Lynx's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and acquiescence.

<u>THIRD AFFIRMATIVE DEFENSE</u>

Caliber is not liable for any damages allegedly suffered by Lynx because any such damages were not legally or proximately caused by any acts or omissions of Caliber.

<u>FOURTH AFFIRMATIVE DEFENSE</u>

Caliber is not liable for any damages allegedly suffered by Lynx because Lynx seeks damages that are unavailable or are speculative and impossible to ascertain.

<u>FIFTH AFFIRMATIVE DEFENSE</u>

Lynx has not suffered any damages as a result of the conduct alleged in the Complaint because its claimed damages are too remote, are the result of other intervening causes, or were not contemplated by the parties when they made the Agreement.

<u>SIXTH AFFIRMATIVE DEFENSE</u>

Lynx cannot recover its damages, in whole or in part, because it has asserted duplicative

damages.

## SEVENTH AFFIRMATIVE DEFENSE

Lynx's claims are barred, in whole or in part, by Lynx's failure to exercise due care or due diligence and/or failure to act reasonably to protect itself from, or to mitigate, any alleged damages.

## EIGHTH AFFIMATIVE DEFENSE

Lynx's claims are barred, in whole or in part, by the doctrine of unclean hands.

## NINTH AFFIRMATIVE DEFENSE

Lynx's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## TENTH AFFIRMATIVE DEFENSE

Lynx's claims are barred, in whole or in part, by the doctrine of unjust enrichment.

## ELEVENTH AFFIRMATIVE DEFENSE

Lynx's claims are barred, in whole or in part, by the doctrine of champerty.

## TWELFTH AFFIRMATIVE DEFENSE

Caliber reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, and any other defenses at law or in equity, that may now exist or in the future become available based on discovery and further factual investigation.

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff Caliber, by and through its undersigned counsel, hereby asserts the following Counterclaims ("Counterclaims") against Plaintiff and Counterclaim-Defendant Lynx and Counterclaim-Defendant Allied First Bank, S.B. d/b/a Servbank f/k/a The Money Source ("Servbank") and alleges as follows:

## PRELIMINARY STATEMENT

113.    Through its Counterclaims, Caliber seeks relief from Lynx's continuing efforts to disown its obligations to Caliber in connection with the transfer of Caliber's servicing rights, including (a) to ensure that Caliber receives the reimbursement due to it for millions of dollars in out-of-pocket servicing advances that Caliber made for Lynx's benefit (the "Unpaid Servicing Advances") and (b) to fairly compensate Caliber for its valuable mortgage servicing rights (the "Servicing Rights").  Caliber is entitled to both under the parties' Agreement (defined below).

114.    First, the plain language of the Agreement entitles Caliber to the Unpaid Servicing Advances and provides Caliber a process for reimbursement both during the operation of the Agreement and, as here, in the event that Caliber is terminated or resigns as servicer and its servicing rights are transferred to a successor servicer.  Lynx is required to ensure that Caliber receives the Unpaid Servicing Advances, but has refused to comply with Caliber's requests for reimbursement.  Moreover, it has colluded with Caliber's successor, Servbank, which has control and possession over the Unpaid Servicing Advances and yet inexplicably refuses to remit the funds to Caliber.

115.    Second, Lynx further agreed that upon termination of Caliber's role as servicer and transfer of the Servicing Rights, Lynx would pay Caliber the value of the Servicing Rights, through a process by which Lynx would hire a nationally recognized valuation firm to prepare a reasonable, good-faith valuation of the Servicing Rights (the "Servicing Value").  This value would "be

reasonably determined in good faith" and verified via "a written computation showing [the] calculation" to be furnished to **both** Lynx and Caliber.

116.    Lynx retained SitusAMC LLC ("Situs") to prepare the Servicing Value.  Rather than include Caliber in the process, however, Lynx communicated *ex parte* with Situs, including providing Situs with unknown assumptions that Situs was to consider in conducting the valuation. Situs ultimately arrived at a negative $2,151,646 valuation (the "Lynx Valuation").  Despite Caliber's reasonable demands for its contractual right to review the written computation used by Situs, Lynx continues to refuse to share with Caliber, and Caliber cannot determine from any other sources, the methodology used to calculate the Lynx Valuation.  Lynx's demand for the Lynx Valuation is particularly concerning considering Situs generated a different value for Caliber and Lynx's now-public history of improper *ex parte* communications with Situs that operated to distort another MSR valuation process.[1]

117.    Rather than proceed in good faith, Lynx has relied on deception to evade its obligations under the Agreement.  At each turn, Lynx has attempted by whatever means necessary not only to swindle Caliber out of millions of dollars of fair compensation, but to purport to reverse its obligations, and demand that Caliber **pay Lynx**.

118.    Caliber seeks equitable and other relief from this Court to remedy the continuing breaches and misconduct of Lynx and Servbank alleged herein.  By means of the breaches, misconduct, and deception described below, Lynx is attempting to steal millions of dollars owed to Caliber.

---

[1]    *See Lynx Whole Loan Acquisition LLC v. Nationstar Mortgage LLC*, No. 2022-1203-LWW (Del. Ch. Ct.), Nationstar's Post-Trial Answering Brief on Lynx's Claims and Opening Brief on Counterclaims (filed July 10, 2024) ("Nationstar Counterclaims Brief"), at 26-27.

## THE PARTIES

119.    Counterclaim-Plaintiff Caliber is a corporation based in Texas and organized under the laws of the State of Delaware.  With its affiliates, Caliber is one of the largest home loan servicers in the country, servicing mortgage loans for millions of homeowners.

120.    Counterclaim-Defendant Lynx is a limited liability company based in Colorado and organized under the laws of the State of Delaware.

121.    Counterclaim-Defendant Servbank is an Illinois state-chartered savings bank with its principal place of business located at 3201 Orchard Road, Oswego, Illinois 60543.

## JURISDICTION

122.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332.  There is complete diversity of citizenship as Lynx is a citizen of Colorado, Servbank is a citizen of Illinois, and Caliber is a citizen of Delaware and Texas.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has subject matter jurisdiction because the Counterclaims arise from and relate to the same controversies, transactions, and occurrences giving rise to Lynx's claims in this action.

123.    This Court has personal jurisdiction over Lynx because Lynx irrevocably submitted to the exclusive jurisdiction of state and federal courts of New York county under the Agreement.

124.    This Court has personal jurisdiction over Servbank, because the claims against Servbank arise from its acceptance of rights and obligations as subservicer to the transferee of the Servicing Rights and as the designated successor servicer under the Agreement.

125.    The Court is an appropriate venue because under Section 6.07 of the Agreement, "[a]ny legal proceeding" involving claims "arising under or relating to" the Agreement "shall be

commenced, heard, and determined exclusively in any state or federal court located in New York county in the State of New York."

## FACTUAL ALLEGATIONS

**I.    Background of Caliber's Business and Mortgage Loan Origination and Servicing**

126.    Caliber is an originator and servicer of home mortgage loans.

127.    The originator of a home mortgage loan is the entity that initially extends the mortgage loan to the borrower.  The originator often does not maintain ownership of the mortgage loan; rather, the originator often sells the loan to a new owner, such as a bank or other investor in the secondary mortgage market.

128.    The servicer of a home mortgage loan handles the daily management and administration of the loan account, including billing for and collecting loan payments and remitting them to the owner of the loan; ensuring property taxes on the mortgaged property are paid and the property is appropriately insured and maintained; and working with borrowers who encounter difficulties making payments (for example, through forbearance, repayment plans, or loan modifications) to mitigate losses and avoid foreclosure if the loan becomes delinquent.  In the event of an incurable default, the servicer is also responsible for foreclosures and the maintenance and disposition of property that the loan owner acquires through foreclosure or a deed in lieu of foreclosure transaction.  The servicer is compensated for these services by retaining a small servicing fee from the borrower payments it remits to the owner of the loan.

129.    The mortgage servicing rights—the rights associated with servicing a mortgage loan and collecting the servicing fee—are an asset that is distinct and severable from the underlying mortgage loan.  Loans may be sold without affecting the servicing rights for those loans, and likewise servicing rights may be sold without affecting ownership of the underlying loan.

130.    Some of the loans that Caliber originates and services, such as the loans at issue in this case, are eligible to be insured or guaranteed under federal programs administered by the U.S. Department of Veterans Affairs, the U.S. Department of Agriculture, and the Federal Housing Administration.  Loans under these programs are eligible to be delivered into pools collateralizing mortgage-backed securities ("MBS") issued by the Government National Mortgage Association ("Ginnie Mae").

131.    When it delivers such loans to Ginnie Mae, Caliber sells the loans to Ginnie Mae but retains its servicing rights and continues to service the loans.

132.    For loans in a Ginnie Mae MBS pool, if the homeowner becomes delinquent, the servicer is required to advance the missed payments to investors in the MBS, with the understanding that it will later recoup these advanced payments from one of multiple potential sources.

133.    When a homeowner misses three or more payments, Ginnie Mae guidelines afford servicers like Caliber the right to exercise an early-buyout option ("EBO") to repurchase the delinquent loan.  Doing so eliminates the servicer's obligation to continue advancing principal and interest to pay investors in the Ginnie Mae MBS but requires the servicer to pay off the defaulted loan's remaining principal balance.

134.    If Caliber exercises its EBO, and the homeowner resumes making consistent payments (often as a result of a modification of the loan's terms to make payments more affordable), an EBO loan may become reperforming and thus eligible for redelivery to Ginnie Mae to be resecuritized into a new MBS.

135.    Investors can provide a source of funding for servicers to exercise their EBO.  In some EBO loan-related transactions, the investor will buy EBO loans from the servicer, but the

servicer will retain the servicing rights. The servicer will work with the delinquent borrower to make the loan become reperforming (often through a modification) and eligible for redelivery. The investor receives any payments of principal and interest from the loans while it owns the loans and stands to profit from any gains upon redelivery if such loans are redelivered to Ginnie Mae. Conversely, the investor risks incurring a loss if the default cannot be cured or the loan returns less value upon sale than what was expended to fund the EBO.

136.    In addition to advancing missed payments to investors in a Ginnie Mae MBS, a servicer is responsible for advancing certain costs to preserve the value of the collateral securing the loan. These are known as servicing advances. The servicer later recoups those servicing advances from various sources.

137.    Such servicing advances may include, as examples:

a.    **Property taxes.** Mortgage loans often require that the borrower include in their monthly payment an amount for payment of property taxes, which the servicer holds in an escrow account until the taxes are due, whereupon the servicer withdraws the taxes owed from the escrow account and pays them to the taxing authority. If the borrower is in default and has not made the required escrow payments for taxes, the servicer pays the taxes when due as a servicing advance to preserve the priority of the loan owner's lien in the collateral. If taxes are not required to be escrowed, but the borrower fails to pay property taxes when due, the servicer will also pay the taxes as a servicing advance to protect the loan owner's lien.

b.    **Insurance premiums.** Mortgage loans also require that appropriate property insurance be maintained on the property to protect the loan owner's collateral as well as the borrower's equity in the home. If the borrower fails to pay the insurance premium or to obtain the required insurance, the servicer pays the premium or obtains insurance on the borrower's behalf as a servicing advance.

c.    **Property inspections, maintenance, and repairs.** The servicer periodically inspects the property to ensure that it is appropriately maintained to protect the value of the loan owner's collateral as well as the borrower's equity in the home. The servicer mitigates risk of loss or liability by making any necessary repairs or providing required maintenance as a servicing advance.

d.   **Foreclosure fees and costs.**  If the loan is in default and a work-out is not possible, the servicer is responsible for foreclosing on the collateral.  The servicer pays the associated legal fees and other costs of foreclosure and sale of foreclosed properties as a servicing advance for the benefit of the loan owner and any government guarantor.

e.   **Claims.**  If a partial claim or other modification has been completed as part of a work-out with the borrower, the servicer brings the original loan current as a servicing advance for the benefit of the loan owner and files a claim with the government guarantor or insurer to recover that servicing advance.

138.   Servicing advances are not paid for the servicer's benefit.  Rather, they are effectively a loan extended by the servicer to the loan owner to protect the owner's interest in the collateral, and that loan is required to be repaid.

139.   Servicing advances also protect (a) the borrower, who might, for example, otherwise lose their home to a tax lien or an uninsured catastrophe, and (b) the government guarantor or insurer, by ensuring that the collateral is protected and losses are mitigated.

140.   Sources of repayment for servicing advances include payments by the borrower, recoveries from foreclosure sales, claims paid by the government guarantor or insurer, and recoupment from the owner of the loan.

141.   Because servicing advances can represent significant out-of-pocket costs, and include advances for payments guaranteed by the government, servicers make these advances conditioned on the clear understanding and expectation, in accordance with customary practice, that they will recoup such advances from one or more of the potential sources.  As the term "advance" implies, they are a loan, not a gift, and servicers make those loans only on the condition that they will be repaid.

## II.    The Agreement

142.   On December 30, 2020, Caliber and Lynx entered into a Mortgage Loan Purchase, Sale, and Servicing Agreement (the "Agreement," attached to Lynx's Complaint as Exhibit A,

provisions of which are cited herein as "§"), a master agreement that created a framework for Lynx to purchase EBO loans from Caliber.  Thereafter, Lynx purchased from Caliber portfolios consisting of approximately $1.769 billion of government-backed mortgage loans (the "Mortgage Loans").  All the Mortgage Loans at issue in this case are EBO loans, and thus delinquent loans as to which Caliber exercised its EBO.

143.    Under the terms of the Agreement, Caliber would sell ownership of the Mortgage Loans to Lynx but would retain the Servicing Rights for the loans and continue to act as servicer.

144.    If Caliber was able, through a modification or otherwise, to return a loan to reperforming status, such that it was eligible for redelivery to Ginnie Mae, the Agreement provided a mechanism whereby Caliber could offer to repurchase the reperforming loan.  If the parties agreed to a repurchase of a reperforming mortgage loan, Caliber would redeliver the loan to Ginnie Mae.  *See* §§ 1.01 (definitions of "Securitization Premium"), 24.05(c).

145.    The Agreement is governed by New York law, § 15; may be amended only through a mutually signed writing, § 17; supersedes all prior arrangements and understandings, § 19; and provides for an award of reasonable attorneys' fees to a prevailing party in litigation arising out of the Agreement, §§ 6.05(a) and (b).

### A.    Termination

146.    Section 24.12 of the Agreement sets forth three ways that Caliber's role as servicer may be terminated.  *First*, Lynx may terminate Caliber where an "Event of Termination" has occurred and is continuing.  § 24.12(a).  *Second*, either party may terminate the Agreement without cause, upon mutual consent.  § 24.12(b).  *Third*, Caliber may resign as servicer if it determines "that its performance of a material portion of the material servicing functions identified in Section 24 would be impermissible pursuant to Applicable Law or applicable Agency Requirements."  § 24.12(c).

147.    Under Section 24.13 of the Agreement, termination shall not become effective until the latest of: (a) the selection and appointment by the Purchaser, in its sole discretion, of a Successor Servicer to perform all loan administration, collection, and servicing functions with respect to the Mortgage Loans, (b) the execution and delivery by the Successor Servicer of a written acknowledgment accepting such appointment on and as of the Servicing Transfer Date specified therein, and (c) the Servicing Transfer Date specified in such written acknowledgment." Following termination, the "Successor Servicer" becomes "fully vested with all authorities, duties, powers, rights, and responsibilities relating to the administration, collection, and servicing of the Mortgage Loans."  § 24.13.

### B.    Servicing Rights Valuation and Transfer

148.    The Servicing Rights constitute a valuable asset retained by Caliber as Servicer upon selling the Mortgage Loans to Lynx.

149.    If Caliber's role as Servicer is terminated pursuant to Section 24.12 of the Agreement, and the Servicing Rights are transferred to a successor servicer, the Agreement provides a process by which Lynx must pay Caliber the value of the Servicing Rights.

150.    Under Section 24.12(b) of the Agreement, Lynx is required to engage a nationally recognized provider of valuation services (the "Servicing Rights Valuation Provider") to determine the value of the Servicing Rights (the "Servicing Value"), and to issue such determination to Caliber:

> [Lynx] … promptly shall engage, at its sole cost and expense … a leading dealer in the mortgage loan servicing market that is not affiliated with [Lynx] or [Caliber], that satisfies all the criteria which the engaging Party applies generally at the time in deciding whether to engage a dealer, and that otherwise is selected by such Party *in good faith* to determine the amount (the "Servicing Value"), if any, that would be paid to the Seller's successor as servicer of such Mortgage Loans (expressed as a negative number) or by such Successor Servicer (expressed as a positive number) in consideration of an agreement between such Successor Servicer and [Lynx]

to service such Mortgage Loans on substantially the same terms and conditions as set forth in this Agreement. The Servicing Value shall be ***reasonably determined in good faith*** by such dealer on the basis of the total Servicing Compensation anticipated to be received, the total costs, expenses, losses, and other liabilities anticipated to be incurred and the total unrecovered advances anticipated to be made by such Successor Servicer in connection with servicing such Mortgage Loans on such terms and conditions, and the ***engaging Party shall cause such dealer [to] furnish to [Lynx] and [Caliber] a written computation showing its calculation of the Servicing Value*** as soon as reasonably practicable after being engaged.

§ 24.12(b) (emphasis added).

151.    As set forth in Section 24.12(b), if the Servicing Rights have a positive value, Lynx is required to pay Caliber their value, and upon receipt of payment, Caliber is required to transfer the Servicing Rights:

> If that amount is a positive number, [Lynx] shall pay it to [Caliber]. . . . Such payment shall be made on the date that the Servicer Termination becomes effective . . . . [Caliber] shall transfer the servicing of such Mortgage Loans and [Lynx] otherwise shall cause the Servicer Termination to become effective with respect thereto not later than the day that is 30 days after the day as to which the related notice of termination is given . . . .

§ 24.12(b).

152.    Conversely, if the Servicing Rights' value is negative, Caliber is required to pay Lynx. § 24.12(b).

### C.    Appointment of Successor to the Servicer

153.    In the event of a termination and transfer of servicing, the successor to Caliber's role as servicer assumes the rights and responsibilities of the servicer under the Agreement. *See* § 24.13. Because transferring the Servicing Rights in a seamless manner so as to avoid any adverse impact on borrowers requires a significant amount of advance work, including notice to borrowers, the parties negotiated for appointment of the entity who would serve as successor servicer before the transfer could become effective.

154.    Specifically, Lynx agreed that before a termination and transfer would be complete, it would appoint a successor servicer.

> Section 24.13 Effectiveness of Termination.  A Servicer Termination shall not become effective until the latest of (a) the selection and appointment by [Lynx], in its sole discretion, of a Successor Servicer to perform all loan administration, collection, and servicing functions with respect to the Mortgage Loans, (b) the execution and delivery by the Successor Servicer of a written acknowledgment accepting such appointment on and as of the Servicing Transfer Date specified therein, and (c) the Servicing Transfer Date specified in such written acknowledgment.

155.    On or around December 16, 2022, Lynx appointed Servbank as the Successor Servicer.    Servbank accepted the appointment, thereby acceding to the obligations and responsibilities imposed by the Agreement.  *See* § 24.13.

### D.    Recoupment of Unpaid Servicing Advances

156.    As servicer, Caliber made millions of dollars of servicing advances to preserve the value of the collateral securing the Mortgage Loans,[2] including the Unpaid Servicing Advances.

157.    The Unpaid Servicing Advances were not made for Caliber's benefit but rather principally for Lynx's benefit, to protect the value of Lynx's collateral, and Caliber expected to be repaid for the Unpaid Servicing Advances, as provided in the Agreement.

---

[2]    The Agreement defines a "Servicing Advance" as "any Corporate Advance or Escrow Advance made by or on behalf of the Mortgage in connection with the servicing of such Mortgage Loan."  § 1.01.  In turn, the Agreement defines "Corporate Advance" as "any out-of-pocket advancement, expenditure, or other payment of funds (other than Escrow Advances) made by or behalf of the Mortgagee in connection with (a) the inspection, management, marketing, maintenance, preservation, restoration, or sale" of the property, or "(b) the investigation, prosecution, defense, or appeal of any Foreclosure Action, bankruptcy case, insolvency proceeding, or other legal proceeding relating to such Mortgage Loan" or property.  § 1.01.  An "Escrow Advance" is "any out-of-pocket advancement, expenditure, or other payment of funds made by or on behalf of the Mortgagee for the payment of homeowners' association charges, ground rents, insurance premiums, leasehold payments, municipal assessments, property taxes, sewer rents, water charges, or other amounts that are required to be escrowed by the Mortgagor pursuant to the Mortgage Loan Documents or that, if not timely paid, may become a lien upon the Mortgaged Property …, including any penalties and interest incurred as a result of the late payment or non-payment thereof."  § 1.01.

158.    Caliber would not have entered into the Agreement or made the Unpaid Servicing Advances without Lynx's agreement that, in accordance with industry practice and fundamental commercial expectations, Caliber would be repaid for the Unpaid Servicing Advances.

159.    The Agreement implemented this right by expressly providing Caliber a process for reimbursement both during the operation of the Agreement and in the event that Caliber is terminated or resigns as Servicer and the Servicing Rights are transferred.

160.    Specifically, the Agreement provided for the establishment of a Custodial Account and Escrow Accounts into which payments and collections received relating to the Mortgage Loans would be deposited.  §§ 24.06(a) (Custodial Account) and 24.06(b) (Escrow Accounts). Principal and interest payments by the borrower, backstop proceeds from the government guarantor or insurer, and certain other proceeds were deposited in the Custodial Account, § 24.06(a), and the borrower's escrow payments and certain insurance or condemnation proceeds attributable to that Mortgage Loan were deposited in the Escrow Accounts, § 24.06(b).

161.    The Agreement provided Caliber the unilateral right to withdraw funds from the Custodial Account to reimburse itself for the Corporate Advances.  As to the other type of Servicing Advance—Escrow Advances—the Agreement required Caliber to provide Lynx various supporting information regarding the Escrow Advances Caliber had made.  § 24.07(d).  Within 30 days of Caliber's compliance with this requirement, Lynx "shall reimburse [Caliber] for each … Escrow Advance that [Lynx] reasonably determines constitutes a Reimbursable Escrow Advance."[3]  § 24.07(d).

---

[3]    The Agreement defines "Reimbursable Escrow Advance" as "any reasonable and necessary Escrow Advance (excluding any penalties and interest incurred as a result of the late payment or non-payment thereof) made by the Seller in connection with the servicing of the Mortgage Loan before the related Servicing Transfer Date, but only to the extent such Escrow Advance (a) was made by the payor in accordance with Customary Servicing Procedures, (b) is

162.    The Agreement also provided that, among Caliber's servicing duties, it was to "disburse and, if necessary, advance (i) at [Caliber']s sole cost and expense *with reimbursement from [Lynx]* pursuant to Subsection 24.07(d), all Escrow Payments … and (ii) at [Caliber's] sole cost and expense without reimbursement from [Lynx], *but with such costs and expenses being a Corporate Advance that [Caliber] may recoup . . .* , all Corporate Advances and other amounts due or payable in connection with or relating to any Mortgage Loan, Mortgaged Property, or REO Property."  § 24.03(e) (emphasis added).

163.    These provisions of the Agreement provided Caliber with assurance that, while it acted as servicer, it would be reimbursed for its payment for the Servicing Advances, including through contractually authorized withdrawals from the Custodial Account.

164.    Once a servicing transfer occurs, however, the successor servicer steps into the shoes of the prior servicer and may begin collecting payments in respect of servicing advances from borrowers, government guarantors or insurers, property sales, or the loan owner in the same way as the prior servicer would have if it had remained the servicer on the loans.  The successor servicer also becomes responsible for maintaining, and entitled to withdraw from, any custodial and escrow accounts.  Accordingly, an arrangement must be made between the prior servicer and the successor servicer for the reimbursement of the prior servicer's unreimbursed servicing advances.  Typically, unless otherwise agreed between the prior and successor servicers, as part of the reimbursement or settlement process for servicing advances, the prior servicer will provide the final balances, and the prior and successor servicers will work together to resolve any questions or issues in a manner agreed prior to transfer, to iron

---

allowable by and eligible for recovery from the applicable Agency pursuant to applicable Agency Requirements, and (c) has not previously been recovered by or reimbursed to the Seller."  § 1.01.

out the details of that reimbursement. This is sometimes referred to as a settlement or balancing process.

**III.     Caliber Resigns as Servicer and Transfers Its Valuable Servicing Rights**

165.    In early 2022, the Federal Reserve raised interest rates. Because Lynx's investment and outlays under the Agreement involved exposure to credit risk, Lynx reportedly suffered significant losses as a result of its ownership of the Mortgage Loans it purchased from Caliber.

166.    Trying to pass the blame for its own poor bets, Lynx began asserting baseless make-whole demands against Caliber and other servicers who Lynx had retained.[4] Lynx sent Caliber its first formal make-whole demand on July 8, 2022, which Caliber rejected. It sent another make-whole demand on August 16, 2022, a purported "Notice of Examination and Audit" on September 9, 2022, and yet another make-whole demand on November 16, 2022.

167.    Caliber attempted to resolve the parties' differences only to be met with unproductive communiques and new baseless demands from Lynx. On November 18, 2022, after months of attempting in good faith to find a mutually agreeable solution, Caliber resigned as servicer under Section 24.12(b) of the Agreement.

168.    Upon resigning, Caliber began working with Lynx and Servbank to coordinate the transfer of the Servicing Rights, including through weekly meetings spanning the ensuing months

---

[4]      As interest rates rose and made EBO investments far less profitable for Lynx and other investors, employees of PropCap, Lynx's affiliate, learned that their hedging strategy was premised on key misunderstandings. *See* Nationstar's Post-Trial Answering Brief on Lynx's Claims and Opening Brief on Counterclaims at 21-22, *Lynx Whole Loan Acq. LLC v. Nationstar Mortg., LLC,* C.A. No. 2022-1203-LWW (Docket No. 569) (Del. Ch. 2024). Faced with these unexpected losses, Lynx began casting around for ways to recoup its failed bet by extracting recoveries from its servicers. *Id.* at 21. A PropCap employee prepared reports in April 2022 noting amounts allegedly lost due to "under hedg[ing]," with respect to loans serviced by The Money Source (Servbank's predecessor), New American Funding, Nationstar, and Caliber. *Id.* Lynx then sent similar demands to multiple servicers alleging servicing deficiencies and demanding to be "made whole." *Id.* at 23.

during which Caliber and Servbank discussed the logistics and required information to complete the transfer.  In the course of such coordination, Caliber provided information necessary for Servbank to track and collect repayment of the Unpaid Servicing Advances from the borrower, the government guarantor or insurer, or other source of recovery once the transfer was complete and to deliver those repayments to Caliber to reimburse Caliber for the Unpaid Servicing Advances.

169.    The transfer of the Servicing Rights was scheduled to occur on March 1, 2023.

170.    By the parties' agreement, the transfer occurred on March 3, 2023.  The purpose of the delay was to give Caliber sufficient time to inform borrowers that the servicing of their mortgages was being transferred.

## IV.    The Servicing Rights Valuation Dispute:  Lynx's Wrongful Conduct in the Contractually Mandated Servicing Rights Valuation Process

### A.    Lynx Breaches the Agreement by Procuring a Tainted, Unreasonably Determined Servicing Rights Valuation

171.    Upon Caliber's November 18, 2022, resignation as servicer, Lynx was obligated by Section 24.12(b) to "engage a leading dealer in the mortgage loan servicing market" to conduct a "good faith" valuation of the Mortgage Servicing Rights.  Lynx engaged Situs to conduct the Servicing Valuation, doing so without any input from Caliber despite Caliber's December 12, 2022, request to "be involved in the selection of the dealer that will conduct the valuation."

172.    Lynx reached out to Situs *ex parte* in connection with the Service Valuation.  It did not include Caliber in any of its communications with Situs, including which assumptions Lynx directed Situs to use for the Servicing Valuation or the purpose of the valuation (*i.e.*, whether the valuation was for Lynx's own internal purposes or for the straightforward valuation required by the Agreement).  Lynx knew that Caliber would likely have challenged those assumptions and would have notified Situs of the purpose of the valuation.

173.    On March 2, 2023, Lynx informed Caliber that Situs would not release its valuation unless Caliber first signed an agreement providing a release of Situs and disclaiming reliance on Situs's purported valuation for any purpose (the "Non-Reliance Agreement").

174.    Situs's insistence that Lynx and its retained mortgage servicer sign a Non-Reliance Agreement before it would release the valuation was not limited to the valuation of Caliber's Mortgage Servicing Rights; Situs made the same demand, on the same day, in connection with an MSR valuation for a different Lynx-retained servicer, Nationstar.[5]  Like with Caliber, Lynx used *ex parte* communications and misrepresentations to distort Nationstar's MSR valuation process.[6] The request prompted Nationstar to contact Situs, who revealed to Nationstar that Lynx had hidden from Situs the purpose of the valuation and the context of the parties' dispute and had directed Situs to use a set of incorrect assumptions for the valuation, different from the ones Situs typically uses.[7]  Nationstar subsequently asked Situs to run a standard fair-market valuation (*i.e.*, using the same methodology Situs would use for any other servicer), which resulted in the valuation jumping from negative $7 million to a positive $10 million.[8]  After Situs declared that its Lynx-directed valuation could not be relied on, Lynx  decided to engage a different provider to value Nationstar's mortgage servicing rights.[9]

175.    Caliber did not learn of Lynx's manipulation of the Nationstar valuation until months later, via litigation between Nationstar and Lynx.  By that time, Caliber had already signed

---

[5] March 2, 2023.

[6] *See* Nationstar Counterclaim Brief at 26-27.

[7] *Id.* at 26.

[8] *Id.* at 27.

[9] *Id.*

the Non-Reliance Agreement, conveyed by Lynx.  A few hours later, Lynx sent Caliber the Lynx Valuation of *negative* $2,151,646.

176.    Caliber was surprised that the Servicing Rights would have a negative $2 million value, which could not be reconciled with the fact that the vast majority of the underlying loans were performing and therefore generating servicing fees, and that the borrowers had substantial equity in their homes and therefore a powerful incentive to continue performing and avoid foreclosure.

177.    On March 2, 2023, Caliber asked Situs to perform a standard valuation of the Servicing Rights, based on the data Situs already had about the Mortgage Loans and the Servicing Rights, using the same methodology Situs would use in the ordinary course for any other servicer, and without applying Lynx's assumptions.  Situs performed the requested valuation and concluded that the value of the Servicing Rights was negative $643,814 – a difference of more than *$1.5 million*.  Caliber also performed its own internal valuation, arriving at a valuation of *positive* $387,832. On March 17, 2023, Caliber informed Lynx of the separate valuations performed internally and by Situs, proposing a compromise whereby the Mortgage Servicing Rights would be valued at zero dollars.

**178.**    Caliber subsequently explained to Lynx that it was "simply looking to understand how the valuation was determined" and that it wished to "have a constructive conversation about the value to ensure it was reasonably determined," as required by the Agreement.  To that end, on April 4, 2023, Caliber asked Lynx to provide information about the assumptions used in the Lynx Valuation and how certain costs and fees were modeled or determined.  Despite Section 24.12(b)'s requirements that Lynx act in good faith and ensure its retained valuation provider submit to Caliber a "written computation showing [the] calculation" used in arriving at the valuation, Lynx

refused Caliber's reasonable request for this contractually mandated information, insisting that Caliber needed to first share with Lynx the separate Situs valuation and Caliber's internal valuation. Caliber provided both valuations despite no obligation to do so.

179.   In direct violation of Section 24.12(b), and further evidence of its bad faith, Lynx *still* refused to provide the information that Caliber needed to assess whether the Lynx Valuation was conducted reasonably and in good faith, as required by the Agreement.

180.   To date, Lynx has refused to share *any* information about Situs's methodology or answer basic questions about the assumptions used to arrive at the Lynx Valuation.

## V.   Lynx's Wrongful Conduct to Subvert the Contractually Mandated Reimbursement of Caliber's Unpaid Servicing Advances

181.   In performing its obligations under the Agreement, Caliber incurred over $6 million in unreimbursed but otherwise recoverable Unpaid Servicing Advances. In accordance with the Agreement, Caliber was required to be reimbursed for its Unpaid Servicing Advances. Such reimbursement is required not only under the Agreement, but by complying with industry norms and practices, which dictate that unpaid servicing advances are to be reimbursed in a single aggregate payment at or around the time of a servicing transfer. This standard accords with the reality that servicing advances are indeed *advances*—*i.e.*, funds the servicer expends for the benefit of the loan's owner, on the understanding that those funds will eventually be repaid—and underscores the inequality of Lynx's reading of the Agreement to relieve it of its obligation to reimburse Caliber for the Unpaid Servicing Advances. Caliber incurred the Unpaid Servicing Advances for Lynx's benefit, not for its own, in the expectation that it would be repaid, even in the event of a servicing transfer. The Unpaid Servicing Advances were a loan, not a gift, and there is no justification for Lynx to retain the recoveries in respect of those Unpaid Servicing Advances that rightfully belong to Caliber.

182.    Following its November 18, 2022, resignation as servicer, Caliber worked diligently to prepare for the Servicing Rights transfer.  Lynx advised Caliber that Servbank would be Lynx's subservicer and would service the Mortgage Loans on Lynx's behalf after the Servicing Rights transferred to Lynx.  Accordingly, Caliber met with Servbank on a weekly basis and provided extensive information to Servbank, including information that would be required to allow for the recovery and reimbursement of the Unpaid Servicing Advances.

183.    Throughout these discussions, Caliber believed that the Servicing Rights transfer process was proceeding normally and in the ordinary course, consistent with standard industry practice and the requirement that Caliber would be reimbursed for its Unpaid Servicing Advances.  Without Caliber's knowledge, however, on information and belief, Lynx instructed Servbank not to reimburse Caliber for Caliber's Unpaid Servicing Advances.  Caliber later learned, via public court filings, that Lynx had also instructed Servbank to withhold unpaid servicing advances Nationstar had incurred on Lynx's behalf.[10]

184.    At the time of its resignation, Caliber had incurred, on Lynx's behalf, $3,231,447 in Escrow Advances and $2,816,534 in Corporate Advances.  Before resigning, Caliber had the unilateral right to withdraw funds from the Custodial Account to reimburse itself for the Corporate Advances, but post-resignation Caliber was required to—and did—transfer control of the Custodial Account to Servbank.  Seeking to avoid delays and potential disruptions to homeowners, Caliber continued cooperating with Servbank and Lynx throughout the transfer process with the reasonable understanding that Lynx would abide by its contractual obligations to reimburse Caliber for the Unpaid Servicing Advances.

---

[10] *See* Nationstar Counterclaims Brief at 28-30.

185.   After the transfer was complete, in August 2023, Caliber provided Lynx with an invoice for the Unpaid Servicing Advances, together with the supporting information required by Section 24.07(d) regarding the Escrow Advances Caliber had made on Lynx's behalf.   By providing this information, Caliber triggered Lynx's obligation under Section 24.07(d) to reimburse Caliber for its Escrow Advances within 30 days.

186.   Lynx has refused to reimburse Caliber for either the Corporate Advances or the Escrow Advances made on its behalf, in direct violation of Section 24.07(d).   Lynx has not disputed that Caliber made the Unpaid Servicing Advances, nor has Lynx claimed Caliber's payment of the Escrow Advances were unreasonable under Section 24.07(d).   Instead, Lynx has indicated that—in contravention of industry practice and Caliber's right to reimbursement for the Unpaid Servicing Advances that it had made principally for the benefit of Lynx, as owner of the loans, as well as for the benefit of the borrowers and the government guarantors and insurers—Lynx does not intend to comply with its obligations as to the Unpaid Servicing Advances.

187.   Upon information and belief, Lynx has also colluded with Servbank to prevent Caliber from being reimbursed in violation of the Agreement.

188.   As the "Successor Servicer," Servbank is "fully vested with all authorities, duties, powers, rights, and responsibilities relating to the administration, collection, and servicing of the Mortgage Loans," including the right to Unpaid Servicing Advances from the Custodial Account and Escrow Account, both of which Servbank now controls.  *See* §§ 24.06(a), 24.06(b), and 24.13 (emphasis added).   Despite Servbank's rights under the Agreement and its control over the accounts holding the Unpaid Servicing Advances, it has wrongfully refused to remit the Unpaid Servicing Advances to Caliber.

## FIRST CAUSE OF ACTION
### Against Lynx
### (Breach of Contract – Servicing Rights Valuation)

189.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

190.    The Agreement is a valid and enforceable contract between Caliber and Lynx.

191.    Caliber has fulfilled in all material respects its obligations under the Agreement, including by servicing loans in accordance with the terms of the Agreement.

192.    Lynx has violated the terms of the Agreement with regard to the Servicing Rights Valuation as alleged herein, including by failing to procure a good-faith valuation of Caliber's Servicing Rights.

193.    Lynx is liable to Caliber for such material breaches of the Agreement.

194.    Caliber lacks an adequate remedy at law and is entitled to an order compelling Lynx to comply with its express obligations under the Agreement, including Lynx's obligation to procure a reasonable, good-faith valuation of Caliber's Servicing Rights and pay Caliber based upon the value of the Servicing Rights, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

195.    In the alternative, or in addition, to such equitable relief, Caliber is entitled to recover all of its damages resulting from Lynx's breach of the Agreement, in an amount to be proven at trial, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

**SECOND CAUSE OF ACTION**
**Against Lynx**
**(Breach of Contract – Unpaid Servicing Advances)**

196.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

197.    The Agreement is a valid and enforceable contract between Caliber and Lynx.

198.    Caliber has fulfilled in all material respects its obligations under the Agreement, including by servicing loans in accordance with the terms of the Agreement.

199.    Under Section 24.06, with respect to each Mortgage Loan transferred as part of the Servicing Transfer, Caliber is entitled to recoup any Unpaid Servicing Advances, including those from Mortgagor recoveries thereof, Government Backstop Proceeds, Liquidation Proceeds, and REO Disposition Proceeds actually received by Lynx or Servbank that otherwise would have been recovered by Caliber but for the transfer of the Mortgage Loans.  Those amounts include, but are not limited to, any amounts (i) that Caliber already advanced; (ii) that Caliber would have recovered but for the Servicing Transfer, but that Lynx or Servbank failed to take reasonable steps to recover; and (iii) that are not yet received but that Lynx or Servbank will or should recover in the future for the Unpaid Servicing Advances.

200.    Lynx has impaired Caliber's right to recover and be reimbursed for Servicing Advances under the terms of the Agreement and has failed to reimburse Caliber for the amounts it actually expended pursuant to the Agreement.

201.    Lynx is presently in breach of the Agreement with respect to those funds it or Servbank has already received for the Unpaid Servicing Advances.  Lynx will be in further breach with respect to any such additional funds it or Servbank may receive in the future, or that Lynx or Servbank fails to recover consistent with their obligations under the Agreement, including without

limitation Servbank's obligation to service and administer the Mortgage Loans in accordance with the Agreement. § 24.13.

202.    Lynx is therefore liable to Caliber for such material breaches of the Agreement.

203.    Caliber lacks an adequate remedy at law and is entitled to:  (a) a declaratory judgment that Lynx is obligated to reimburse Caliber for the Unpaid Servicing Advances; (b) an order compelling Lynx to pay to Caliber as soon as practicable (i) all recoveries for Unpaid Servicing Advances Lynx and/or Servbank have received to date and (ii) all recoveries for Unpaid Servicing Advances received by Lynx or Servbank in the future; (c) an order compelling Lynx to direct Servbank to undertake all reasonable efforts to recover reimbursement, to the extent not already recovered, from the sources identified in Section 24.07(d) for Caliber's Unpaid Servicing Advances; and (d) an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

204.    In the alternative, or in addition, to such declaratory and equitable relief, Caliber is entitled to recover all its damages resulting from Lynx's breach of the Agreement, in an amount to be proven at trial, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

## THIRD CAUSE OF ACTION
### Against Lynx
### (Breach of Implied Covenant – Unpaid Servicing Advances)

205.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

206.    This Third Cause of Action is pleaded in the alternative (or, to the extent further or distinct relief is available, in addition) to Caliber's Second Cause of Action.

207.    The Agreement is a valid and enforceable contract between Caliber and Lynx.

208.    Caliber has fulfilled in all material respects its obligations under the Agreement, including by servicing loans in accordance with the terms of the Agreement.

209.    There is implied in every contract a covenant of good faith and fair dealing such that no party to such contract may act to deprive another party of the benefits and bargains of the agreement.

210.    One of the central benefits of the Agreement to Caliber was its right to be reimbursed for Servicing Advances.  Without that right, Caliber would never have agreed to act as the servicer under the Agreement or to make the Servicing Advances required of the servicer thereunder.

211.    Lynx has breached the implied covenant of good faith and fair dealing through any actions or inactions to deprive Caliber of that core benefit.

212.    Lynx is liable to Caliber for such material breaches of the covenant of good faith and fair dealing implied in the Agreement.

213.    Caliber lacks an adequate remedy at law and is entitled to an order compelling Lynx to comply with its obligations under the covenant of good faith and fair dealing implied in the Agreement, including its obligation to ensure its successor servicer exercises reasonable diligence to recover Unpaid Servicing Advances and to ensure Caliber's reimbursement for the Unpaid Servicing Advances, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

214.    In the alternative, or in addition, to such equitable relief, Caliber is entitled to recover all its damages resulting from Lynx's breaches of the covenant of good faith and fair dealing implied in the Agreement, in an amount to be proven at trial, as well as an award of pre- and

post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

## FOURTH CAUSE OF ACTION
### Against Servbank
### (Conversion – Unpaid Servicing Advances)

215.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

216.    This Fourth Cause of Action is pleaded in the alternative (or, to the extent further or distinct relief is available, in addition) to Caliber's foregoing Causes of Action relating to the Unpaid Servicing Advances.

217.    Caliber made the Unpaid Servicing Advances for the benefit of Lynx with the understanding and reasonable expectation that Caliber would be reimbursed for the Unpaid Servicing Advances.  Accordingly, Caliber has a possessory and ownership interest in the Unpaid Servicing Advances pursuant to the Agreement.

218.    Upon the termination becoming effective, custody and control of the Custodial Account transferred from Caliber to Servbank.  Caliber no longer has the authority or ability to reimburse itself the Unpaid Servicing Advances it made on Lynx's behalf by withdrawing the funds from the Custodial Account.

219.    Servbank, as the "Successor Servicer" under the Agreement, is "fully vested with all authorities, duties, powers, rights, and responsibilities relating to the administration, collection, and servicing of the Mortgage Loans," including the right to Unpaid Servicing Advances from the Custodial Account and Escrow Account, both of which Servbank now has dominion and control over.  *See* §§ 24.06(a), 24.06(b), and 24.13.

220.    Servbank has wrongfully retained the Unpaid Servicing Advances and refused Caliber's requests to remit them to Caliber by withdrawing the funds from the Custodial Account.

221.    Caliber has been damaged as a direct and proximate result of Servbank's conduct and is entitled to recover all its damages resulting from Servbank's conversion, in an amount to be proven at trial, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

## FIFTH CAUSE OF ACTION
### Against Lynx
### (Unjust Enrichment – Unpaid Servicing Advances)

222.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

223.    This Fifth Cause of Action is pleaded in the alternative (or, to the extent further or distinct relief is available, in addition) to Caliber's foregoing Causes of Action relating to the Unpaid Servicing Advances.

224.    Caliber made the Unpaid Servicing Advances for the benefit of Lynx with the understanding and reasonable expectation that Caliber would be reimbursed for the Unpaid Servicing Advances.  Lynx benefitted from Caliber's payment of the Unpaid Servicing Advances by not having to advance its own funds.  Lynx also benefitted from Caliber's Unpaid Servicing Advances by having its collateral preserved.

225.    To the extent that Lynx has received and retained payments in respect of Caliber's Unpaid Servicing Advances, or received the benefits of those Unpaid Servicing Advances, without reimbursing Caliber therefor, it has been unjustly enriched at Caliber's expense, and Caliber has been unjustly impoverished.

226.    Caliber lacks an adequate remedy at law and is entitled to restitution from Lynx for the Unpaid Servicing Advances, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

## SIXTH CAUSE OF ACTION
### Against Servbank
### (Unjust Enrichment – Unpaid Servicing Advances)

227.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

228.    This Sixth Cause of Action is pleaded in the alternative (or, to the extent further or distinct relief is available, in addition) to Caliber's foregoing Causes of Action relating to the Unpaid Servicing Advances.

229.    Caliber made the Unpaid Servicing Advances for the benefit of Lynx with the understanding and reasonable expectation that Caliber would be reimbursed for the Unpaid Servicing Advances.  Servbank, as the Successor Servicer, has benefitted from Caliber's payment of the Unpaid Servicing Advances by not having to advance its own funds.  Servbank also has benefitted from Caliber's Unpaid Servicing Advances to the extent that Servbank has received and retained recoveries of the Unpaid Servicing Advances from borrowers, foreclosure sales, and/or claims paid by the government guarantor or insurer.

230.    To the extent that Servbank has received and retained payments in respect of Caliber's Unpaid Servicing Advances, or received the benefits of those Unpaid Servicing Advances, without reimbursing Caliber therefor, it has been unjustly enriched at Caliber's expense, and Caliber has been unjustly impoverished.

231.    Caliber lacks an adequate remedy at law and is entitled to restitution from Servbank for the Unpaid Servicing Advances, as well as an award of pre- and post-judgment interest, attorneys' fees and costs and expenses, and such other relief as the Court deems just and appropriate.

**SEVENTH CAUSE OF ACTION**
**Against Lynx**
**(Contractual Award of Attorneys' Fees)**

232.    Caliber repeats and realleges each of the foregoing allegations, as if fully set forth herein.

233.    Section 6.05(b) of the Agreement provides as follows:  Lynx "shall reimburse [Caliber] for … any and all out-of-pocket Losses" resulting from Lynx's material breach of the Agreement.  "Losses" includes "reasonable attorneys' fees[.]"  § 6.05(a).

234.    In accordance with Section 6.05 of the Agreement, and in addition to the other relief sought herein, Caliber is entitled to payment from Lynx of Caliber's costs and expenses incurred in connection with this litigation, including without limitation Caliber's reasonable attorneys' fees and costs.

**REQUEST FOR RELIEF**

WHEREFORE, Caliber respectfully requests that the Court enter a judgment:

A.    Ordering equitable relief compelling Lynx to comply with its obligations with regard to the Servicing Rights Valuation, including Lynx's obligation to procure a good-faith, reasonable determination of the value of Caliber's Servicing Rights and pay Caliber based upon the reasonable, good-faith value of the Servicing Rights;

B.    Declaring that Lynx is obligated to reimburse Caliber for all Unpaid Servicing Advances;

C.    Ordering equitable relief compelling Lynx to comply with its obligations with regard to the Unpaid Servicing Advances, including its obligation to pay to Caliber as soon as practicable (i) all recoveries for Unpaid Servicing Advances it and/or Servbank have received to date and (ii) all recoveries for Unpaid Servicing Advances received by Lynx or Servbank in the future;

-45-

D.     Alternatively, ordering equitable relief compelling Servbank to remit payment to Caliber equal to the Unpaid Servicing Advances;

E.     Ordering equitable relief compelling Lynx to undertake all reasonable efforts to recover reimbursement, to the extent not already recovered, from the sources identified in Section 24.07(d) for Caliber's Unpaid Servicing Advances;

F.     Awarding Caliber damages in an amount to be proven at trial;

G.     Awarding Caliber pre- and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and all other costs of suit, in accordance with Section 6.05 of the Agreement and/or under New York law; and

H.     Awarding all such other relief as the Court may deem just and proper.

Dated: New York, New York
      June 9, 2025

                                   Respectfully submitted,

                                   ORRICK, HERRINGTON & SUTCLIFFE LLP

                                   By: /s/ Richard Jacobsen

                                      Richard Jacobsen
                                      Thomas N. Kidera
                                      51 West 52nd Street
                                      New York, NY 10019
                                      (212) 506-5000

                                   *Counsel for Defendant and Counterclaim-Plaintiff Caliber Home Loans, Inc.*